FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| **In Re: Rare Breed Triggers Patent Litigation** | **4:26-md-03176-ALM** <br> **MDL 3176** |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> 80MILLS LLC, d/b/a TACTICAL TITAN SUPPLY, and PEARSON GARDNER, <br><br> Defendants. | Civil Action No. 4:26-cv-00380-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> Plaintiffs. <br><br> v. <br><br> CHRISTOPHER COPE, <br><br> Defendant. | Civil Action No 2:26-cv-00033-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DNT LLC, d/b/a DEEZ NUTZ TACTICAL, and ZACH MORROW, <br><br> Defendants. | Civil Action No. 4:26-cv-00377-ALM |

**~~FILED UNDER SEAL~~**

| | |
|---|---|
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> HANES TACTICAL, LLC, and DAMION TERRELL BENNETT, <br><br> Defendants. | Civil Action No. 4:26-cv-00369-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> HARRISON GUNWORKS LLC, and TYLER HARRISON, <br><br> Defendants. | Civil Action No. 4:26-cv-00379-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> Plaintiffs. <br><br> v. <br><br> MARS TRIGGER, LLC, and PETER BRENNEN, <br><br> Defendants. | Civil Action No. 2:26-cv-00030-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> Plaintiffs, <br><br> v. | Civil Action No. 2:26-cv-00056-ALM |

~~FILED UNDER SEAL~~

| | |
|---|---|
| MISTER GUNS, LLC, THOMAS CARTER II, and BRANDI CARTER<br><br>     Defendants. | |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>     Plaintiffs,<br><br>v.<br><br>STEVEN THANH NGUYEN, d/b/a POLYMER PEW,<br><br>     Defendant. | Civil Action No. 4:26-cv-00425-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>     Plaintiffs,<br><br>v.<br><br>OPTICS PLANET, INC., d/b/a ECENTRIA,<br><br>     Defendants. | Civil Action No. 4:26-cv-00521-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>     Plaintiffs,<br><br>v.<br><br>PISTOLCAP LIMITED COMPANY, d/b/a, FRISCO GUNS, and MORDEKHAI HARROCH,<br><br>     Defendants. | Civil Action No. 2:26-cv-00053-ALM |

~~FILED UNDER SEAL~~

| | |
|---|---|
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> PROSOURCE FIREARMS, LLC, <br><br> Defendants. | Civil Action No. 2:26-cv-00055-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SUPERIOR FIREARMS OF TEXAS, LLC, <br><br> Defendant. | Civil Action No. 2:26-cv-00058-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> Z3 PRODUCTIONS, d/b/a Z3PRO, <br><br> Defendant. | Civil Action No. 4:26-cv-00367-ALM |

**DECLARATION OF RICHARD J. EICHMANN IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION**

~~FILED UNDER SEAL~~



ABC IP, LLC and Rare Breed Triggers, Inc.,

**Plaintiffs,**

v.

80 Mills LLC and Pearson Gardner, Christopher Cope, DNT LLC and Zach Morrow, Hanes Tactical LLC and Damion Bennett, Harrison Gunworks LLC and Tyler Harrison, MaRs Trigger, LLC and Peter Brennen, Mister Guns, LLC, Thomas Carter II, and Brandi Carter, Steven Nguyen, Optics Planet, Inc., PistolCap Limited Company and Mordekhai Harroch, ProSource Firearms, LLC, Superior Firearms of Texas, LLC, and Z3 Productions, LLC,

**Defendants.**

Submitted by:

Richard J. Eichmann
May 28, 2026
United States District Court
Eastern District of Texas Sherman Division
In Re: Rare Breed Triggers Patent Litigation
4:26-md-03176-ALM
MDL 3176

~~FILED UNDER SEAL~~

**Table of Contents**

I.      Qualifications and Assignment ........................................................................ 7

II.     Economic Characteristics of the Relevant Market ........................................ 8

III.    Economic Mechanisms of Harm from Alleged Infringement .......................... 12

    A.      Lost Market Share and Permanent Market Displacement ........................ 12

    B.      Lost Lead Time and Market Exclusivity .................................................. 16

    C.      Distribution and Channel Disruption ....................................................... 18

    D.      Price Erosion and Reference Pricing Effects ........................................... 20

    E.      Economic Effects of Market Confusion and Perceived Product Legitimacy ............ 23

    F.      Enforcement Signaling and Cascading Competitive Entry ....................... 24

IV.     Reputational Harm ......................................................................................... 27

V.      Asymmetric Economic Impact of an Injunction ........................................... 29

VI.     Inadequacy of Monetary Damages ................................................................ 31

VII.    Preliminary Context Regarding Materiality (Non-Quantified) ...................... 34

VIII.   Conclusion ..................................................................................................... 36

~~FILED UNDER SEAL~~

## I.    Qualifications and Assignment

1.    My name is Richard J. Eichmann. I am a Managing Director at Secretariat Advisors, LLC ("Secretariat"), an economic consulting firm that provides expert testimony, economic analysis, and valuation services in complex litigation. I have approximately 30 years of experience in economic consulting, including more than 27 years focused on litigation-related engagements. My work centers on the analysis and quantification of economic damages, business valuation, econometric analysis, and the application of statistical and economic methods in commercial disputes. I hold the Certified Valuation Analyst ("CVA") and Master Analyst in Financial Forensics ("MAFF") designations from the National Association of Certified Valuators and Analysts.[1]

2.    My work regularly involves the evaluation and quantification of economic harm associated with intellectual property disputes, including alleged patent infringement, trade secret misappropriation, false advertising, and related competitive conduct. I have been retained in matters involving lost profits, reasonable royalties, unjust enrichment, price erosion, diminution in enterprise value, and the economic effects of competitive displacement. My work also frequently involves the application of industrial organization principles, econometric methods, survey-based analyses, and market-based valuation techniques to evaluate market dynamics, competitive effects, and the reliability of damages methodologies. A detailed summary of my qualifications is provided in **Appendix 1**.

3.    I have been asked by counsel for ABC IP, LLC and Rare Breed Triggers, Inc. ("ABC" and "Rare Breed," respectively; collectively, "Plaintiffs") to evaluate the nature and characteristics of economic harm associated with the alleged design, production, marketing, distribution, and sale of products accused of infringing the Atrius Forced Reset Selector ("Atrius Selector"), MARC Selector, Super Safety, and ARC-Fire Trigger ("ARC-Fire") products (collectively, the "Accused Products") in connection with Plaintiffs' request for

---

[1] My Certified Valuation Analyst (CVA) designation, issued by the National Association of Certified Valuators and Analysts (NACVA), was originally awarded on December 28, 2009, and most recently renewed in June 2025, with the current certification valid through June 2028 (Credential ID 991115). My Master Analyst in Financial Forensics (MAFF) in Commercial Damages designation, also issued by NACVA, was originally awarded on May 25, 2016, and most recently renewed in June 2025, with the current certification valid through June 2028 (Credential ID 703).

~~FILED UNDER SEAL~~

preliminary injunctive relief.[2] My assignment is to evaluate whether the alleged conduct is capable of causing immediate, ongoing, and irreparable economic harm, including harm arising from cumulative competitive effects associated with the presence of multiple competing sellers in the relevant market, and whether such harm would be adequately remedied through monetary damages at the conclusion of the case.

4.    I do not offer legal opinions and do not opine on issues of infringement, validity, enforceability, or willfulness. I have not been asked to quantify damages at this stage. My opinions are based on my professional experience, my review of the pleadings and other case materials, declarations submitted in connection with Plaintiffs' motion, publicly available materials, and established economic principles relating to market competition, dynamic competitive effects, pricing behavior, distribution relationships, customer substitution, and the limitations of ex post damages reconstruction. A list of materials cited in this declaration is provided in **Appendix 2**.

## II.    Economic Characteristics of the Relevant Market

5.    Based on my review of the pleadings, declarations submitted in connection with Plaintiffs' motion, publicly available materials, and information provided by counsel, I understand that the products at issue are durable or semi-durable consumer firearm components within a relatively narrow and specialized product category associated with mechanically resetting trigger functionality for AR-pattern and related firearm platforms.[3] Record materials,

---

[2] *ABC IP, LLC et al., v. 80MILLS LLC, et al., ABC IP, LLC et al., v. Christopher Cope, ABC IP, LLC et al., v. DNT LLC et al., ABC IP, LLC et al., v. Hanes Tactical, LLC et al., ABC IP, LLC et al., v. Harrison Gunworks LLC et al., ABC IP, LLC et al., v. MaRs Trigger, LLC et al., ABC IP, LLC et al., v. Mister Guns, LLC et al., ABC IP, LLC et al., v. Steven Thanh Nguyen, ABC IP, LLC et al., v. Optics Planet, Inc., ABC IP, LLC et al., v. PistolCap Limited Company et al., ABC IP, LLC et al., v. ProSource Firearms, LLC, ABC IP, LLC et al., v. Superior Firearms of Texas, LLC, ABC IP, LLC et al., v. Z3 Productions, LLC,* Consolidated Motion for Preliminary Injunction, May 28, 2026 ("Consolidated Motion for Preliminary Injunction"), Appendix A.

[3] *See* Declaration of Lawrence DeMonico in Support of Plaintiffs' Motion for Preliminary Injunction ("DeMonico Declaration"), May 28, 2026, ¶¶ 4, 24 (discussing Rare Breed operating only in the resetting trigger product category); Declaration of Brian Luettke in Support of Plaintiffs' Motion for Preliminary Injunction ("Luettke Declaration"), May 28, 2026, ¶¶ 11-31 (describing the forced-reset action of the Rare Breed's products and the Accused Products); Consolidated Motion for Preliminary Injunction.

See also *ABC IP, LLC et al., v. 80MILLS LLC, et al.,* Fourth Amended Complaint for Patent Infringement, May 26, 2026 ("80 Mills Complaint"); *ABC IP, LLC et al., v. Christopher Cope,* Second Amended Complaint for Patent Infringement, May 26, 2026 ("Cope Complaint"); *ABC IP, LLC et al., v. DNT LLC et al.,* Sixth Amended

~~FILED UNDER SEAL~~

including those same Declarations and publicly-available listings, indicate that Plaintiffs' FRT® products are typically priced between approximately $450 and $620, depending on the model and firearm platform,[4] while Defendants offer the Accused Products at substantially lower price points, generally between approximately $80 and $269, with certain Accused Products also available in bundled offerings or as individual components.[5] These price differentials are reflected in observed market offerings and indicate that competing products are marketed at materially lower price points than Plaintiffs' products within the same functional category. The same materials also indicate that the resetting trigger market is relatively recent and has developed under evolving regulatory and legal conditions.[6]

---

Complaint for Patent Litigation, May 27, 2026 ("DNT Complaint"); *ABC IP, LLC et al., v. Hanes Tactical, LLC et al.,* Fourth Amended Complaint for Patent Infringement, May 26, 2026 ("Hanes Complaint"); *ABC IP, LLC et al., v. Harrison Gunworks LLC et al.,* Third Amended Complaint for Patent Infringement, May 27, 2026 ("Harrison Complaint"); *ABC IP, LLC et al., v. MaRs Trigger, LLC et al.,* Second Amended Complaint for Patent Infringement, May 27, 2026 ("MaRs Trigger Complaint"); *ABC IP, LLC et al., v. Mister Guns, LLC et al.,* Second Amended Complaint for Patent Infringement, May 26, 2026 ("Mister Guns Complaint"); *ABC IP, LLC et al., v. Steven Thanh Nguyen,* Third Amended Complaint for Patent Infringement, May 27, 2026 ("Steven Thanh Nguyen Complaint"); *ABC IP, LLC et al., v. Optics Planet, Inc.,* Amended Complaint for Patent Infringement, May 27, 2026 ("Optics Planet Complaint"); *ABC IP, LLC et al., v. PistolCap Limited Company et al.,* Second Amended Complaint for Patent Infringement, May 26, 2026 ("PistolCap Complaint"); *ABC IP, LLC et al., v. ProSource Firearms, LLC,* Second Amended Complaint for Patent Infringement, May 26, 2026 ("ProSource Complaint"); *ABC IP, LLC et al., v. Superior Firearms of Texas, LLC,* Second Amended Complaint for Patent Infringement, May 27, 2026 ("Superior Firearms of Texas Complaint"); *ABC IP, LLC et al., v. Z3 Productions, LLC,* Third Amended Complaint for Patent Infringement, May 26, 2026 ("Z3 Productions Complaint").

[4] I understand Rare Breed markets FRT®-branded products that include the FRT-15L3®, FRT-MR3™, and FRT-15C3™ for AR-15-style rifles and the FRT-RD3™ (SEF) and FRT-RD3™ (AMBI) for the HK MP5/SP5 platform. I refer collectively to Rare Breed's products marketed under these brands as the "Rare Breed FRT® products." *See* DeMonico Declaration, ¶¶ 19-20. *See also* "FRT-15L3™ Single-Stage (3-Position) Forced Reset Trigger for the AR-15" (listing Rare Breed FRT-15L3™ at $450), Rare Breed Triggers, available at https://rarebreedtriggers.com/product/frt-15l3-2/, accessed May 27, 2026; "FRT-MR3™ Single-Stage (3-Position) Forced Reset Trigger for the HK MR223 & HK MR556" (listing Rare Breed FRT-MR3™ at $525), Rare Breed Triggers, available at https://rarebreedtriggers.com/product/frt-mr3/, accessed May 27, 2026.

[5] DeMonico Declaration, ¶ 61; Luettke Declaration, § V.A (discussing sale configurations of the Accused Products); *See also* Consolidated Motion for Preliminary Injunction, Appendix A.

[6] DeMonico Declaration, ¶¶ 7-17 (discussing the Rare Breed's FRT-15® as the first commercially available FRT® product in 2020 and subsequent challenges to the product category's legality). *See also* "Department of Justice Announces Settlement of Litigation Between the Federal Government and Rare Breed Triggers," Office of Public Affairs Press Release, U.S. Department of Justice, May 16, 2025, available at https://www.justice.gov/opa/pr/department-justice-announces-settlement-litigation-between-federal-government-and-rare-breed, accessed May 20, 2026; and "Legal Status of Rare Breed Triggers' Forced Reset Triggers - Rarebreed Triggers," Rare Breed Triggers, available at https://rarebreedtriggers.com/legal-status/, accessed May 20, 2026.

~~FILED UNDER SEAL~~

6.  From an economic perspective, this type of market is more appropriately characterized as a differentiated niche market rather than a commodity market.[7] In commodity markets, products are largely interchangeable and competition occurs primarily along price dimensions. By contrast, markets for differentiated products involve discrete choices among alternatives that are not perfectly substitutable. As a result, substitution does not occur gradually across many comparable options, but instead often takes the form of discrete shifts, where one product can displace another over a relatively short period of time.[8]

7.  Economic research recognizes that, in differentiated niche markets, early adoption patterns can influence later purchasing behavior and competitive positioning over time. Once customers and dealers begin adopting a competing product, those products may become more visible within the relevant distribution channels and more familiar to market participants generally. In markets involving specialized products sold through enthusiast and dealer networks, increased visibility and adoption can influence future purchasing decisions, dealer recommendations, inventory choices, and customer expectations regarding product availability and support. As a result, early competitive displacement may persist even if the original supplier later seeks to restore its market position, because prior adoption patterns can continue to shape subsequent market behavior and purchasing decisions.[9]

---

[7] Commodities are standardized goods that are largely interchangeable regardless of producer, such as crude oil or precious metals. *See* Fernando, Jason, "Commodities in the Stock Market: Definition, Types, and Investment Roles," Investopedia, April 12, 2026, available at https://www.investopedia.com/terms/c/commodity.asp, accessed May 20, 2026.

[8] *See* Berry, Steven T. and Philip A. Haile, "Identification in Differentiated Products Markets Using Market Level Data," Cowles Foundation Discussion Paper No. 1744, January 2010, updated February 2010 ("Models of discrete choice between differentiated products play a central role in the modern empirical literature in industrial organization (IO) and are used in a wide range of other applied fields of economics."), available at https://cowles.yale.edu/sites/default/files/2022-09/d1744.pdf, accessed May 20, 2026; "Commodity Substitution, Sample Space and New Goods," Chapter 9, International Monetary Fund ("[E]volutionary commodities are defined as continuations of the service flow of exi[s]ting ones."), available at https://www.elibrary.imf.org/display/book/9781589067806/ch09.xml, accessed May 22, 2026; "The Role of Substitution in Commodity Demand," The World Bank ("Substitution among commodities is a complex process and can take place at short- and long-term horizons as well as within and across commodity groups."), available at https://thedocs.worldbank.org/en/doc/727481572033451039-0050022019/original/CMOOctober2019SpecialFocus.pdf, accessed May 20, 2026.

[9] Tisdell, Clem, and Irmi Seifl, "Niches and economic competition: implications for economic efficiency, growth and diversity," *Structural Change and Economic Dynamics* 15 (2004): 119-135, at 126 ("A successful (niche) segmentation strategy has several advantages for producers. A firm can reduce the intensity of competition by targeting and securing a defensible segment in the market. In doing so, it can virtually exclude substitute products

10

FILED UNDER SEAL

8.    In such markets, competitive position is shaped not only by price, but also by non-price factors, including product design, perceived reliability, brand identity, and access to distribution channels. Where these non-price attributes play a central role in purchasing decisions, early displacement can lead to durable changes in customer behavior and supplier relationships that do not readily reverse even if the original supplier later reasserts its position.[10] As a result, the economic harm associated with competitive displacement is not limited to lost margins on individual transactions, but includes longer-term erosion of market position.

9.    The market for resetting triggers is highly visible and is sold through specialized firearms channels serving an enthusiast customer base. Products in this category are marketed and sold both direct-to-consumer and through specialized online and brick-and-mortar retailers, where pricing, availability, and brand identity are transparent and readily compared. In this environment, competition occurs at the level of specific products and manufacturers rather than through diffuse substitution. Accordingly, the introduction and continued sale of a competing product through established channels can redirect demand and dealer attention toward that product, altering purchasing patterns and channel relationships in ways that are difficult to reverse once established. The presence of competing products within the same channels can also require changes in how products are distributed and brought to market, reflecting the economic pressure associated with competitive entry.

---

of new entrants. However, the strategy also has risks in a competitive market. These narrow markets are often vulnerable to the changes in taste and demand. Moreover, if demand grows and profits increase beyond a certain point, mass marketers may find new ways to enter the market and compete.").

[10] Manta, Irina D., "Blunting the Later-Mover Advantage: Intellectual Property and Knowledge Transfer," *Akron Law Journals* 52, no. 3 (2019): 877-910, at 878-79 ("Earlier-movers have a tendency to become overtaken by later-movers that learn from, and improve upon, the knowledge of earlier-movers. From the perspective of [IP owners'] economic competitiveness, the danger of knowledge transfer stems not from the prospect of unfair competition but also, in the long run, from the possibility that the recipient might overtake the source by innovating on the knowledge transferred. [The IP owners] that have the earlier-mover advantage in some domain have a strong incentive to protect their intellectual property against later-movers at any one point in time."), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3420210, accessed May 20, 2026.

~~FILED UNDER SEAL~~

## III.  Economic Mechanisms of Harm from Alleged Infringement

### A.  Lost Market Share and Permanent Market Displacement

10.  In markets for durable or semi-durable goods, lost market share resulting from substitution to a competitor is generally difficult to recapture. Unlike consumable goods, which are repurchased frequently and where a lost sale may be deferred to a subsequent purchase cycle, durable goods are typically acquired on an infrequent basis. When competing products exhibit functional overlap, particularly with respect to core functionality not otherwise available on the market, that overlap can create both operational and economic substitutability.[11] As a result, such products may serve as viable alternatives for the same underlying consumer need. When a customer purchases a competing product and satisfies that need, the relevant demand opportunity is effectively exhausted for the foreseeable future. The likelihood that the customer will subsequently purchase the incumbent, displaced product declines substantially because there is no immediate economic reason to reenter the market for that product. Even if the original supplier later prevails in litigation, the customer may have no economic incentive to repurchase the displaced product during its useful life. This principle is well established in the economics literature addressing durable goods competition and intertemporal substitution.[12]

11.  In this context, the introduction and sale of competing products would be expected, as a matter of economic theory, to result in displacement of demand from Plaintiffs' products. According to the DeMonico Declaration, Rare Breed is reported to have experienced material displacement, having held effectively the entire resetting trigger product category

---

[11] I understand that, when assembled and used as intended, the Accused Products enable forced reset semiautomatic functionality and are alleged to embody the technology claimed in the '247, '784, '538, and '159 Patents ("Asserted Patents"). Further, I understand that the alleged conduct relates to the core functionality of the products, and that the same functionality is not available in non-infringing alternative products. *See* Luettke Declaration, §§ IV and V (discussing the forced-reset functionality provided by the Accused Products) and § VI (discussing lack of non-infringing alternatives).

[12] Coase, R.H., "Durability and Monopoly," *Journal of Law and Economics* 15, no. 1 (1972): 143-149, at 144 ("With complete durability [of a good], the price becomes independent of the number of suppliers and is thus always equal to the competitive price."), (using land as an illustrative durable asset to analyze intertemporal substitution). The underlying logic, that a durable good purchase exhausts future demand and that substitution today does not generate offsetting future sales, has been widely applied in the economics literature to durable and semi-durable goods more generally.

~~FILED UNDER SEAL~~

in the market upon launch and estimating now to hold ███████████.[13] Prior market share loss does not itself indicate that the market has already "tipped," but rather that substitution is ongoing. Despite substantial loss in market share to date, continued displacement by infringers at this stage causes incremental irreparable harm because each additional unit diverted to a competing durable product satisfies a demand opportunity that cannot be recreated once exhausted. As the installed base of competing products expands, the remaining pool of uncommitted demand shrinks, increasing the marginal impact of each additional diverted sale and making the resulting displacement progressively more difficult to reverse. Without injunctive relief, additional sales are likely to shift demand into an installed base that is not readily recoverable, making the remaining share increasingly difficult to preserve or restore through monetary relief alone.

12.    The economic harm in this setting is not limited to a single lost unit sale. Rather, substitution to a competing product can disrupt the customer's expected purchasing relationship with the original supplier in ways that are economically significant but not directly observable. A customer who otherwise might have purchased additional units, upgraded to future versions, or recommended the product to other users may be less likely to do so after adopting a competing product that satisfies the same underlying need. These effects operate through changes in future purchasing likelihood, familiarity with alternative suppliers, and word-of-mouth behavior.[14] As a result, the harm is not a discrete, one-time lost transaction, but a reduction in the expected stream of future demand associated with that customer. Because these effects depend on heterogeneous customer behavior and counterfactual purchasing decisions that cannot be directly observed, they are difficult to measure precisely, even with transaction-level data, to fully reconstruct the but-for stream of demand associated with those customers after the fact. These dynamics are consistent with the types of shifts in purchasing behavior that occur when customers and dealers adopt competing products rather than continuing or expanding purchases of the incumbent product.

---

[13] DeMonico Declaration, ¶ 75.

[14] For example, the DeMonico Declaration indicates that over ████ of Rare Breed's customers are repeat purchasers who have purchased more than FRT®. *See* DeMonico Declaration, ¶ 74.

13

~~FILED UNDER SEAL~~

13.   Market displacement is amplified where competing products are compatible with a common installed base. When functionally similar accessory products are designed to operate with the same underlying platforms, they compete directly for the same pool of potential customers. Overlapping compatibility expands the set of consumers for whom competing products are viable substitutes, increasing the likelihood that a single substitution event results in durable displacement within that installed base. Because these products satisfy the same functional need within a shared platform, the purchase of a competing product effectively removes that customer from the addressable market for the incumbent for the duration of the product's useful life, reducing the future demand available to the incumbent. In such settings, once a customer selects a competing product, the opportunity for the incumbent to supply that customer is substantially reduced for that period.

14.   Economic research further recognizes that substitution in durable goods markets is often front-loaded: competitive entry captures demand that would otherwise have accrued to the incumbent, and that demand does not return after the period of competition ends. In narrow or specialized markets, where the total pool of potential customers is limited and sales opportunities are finite, these effects are magnified. Each substitution represents a meaningful portion of total demand, and early displacement can materially alter the trajectory of market share over time. As the installed base of competing products expands, the remaining pool of potential customers contracts, increasing the relative importance of each incremental sale and reinforcing the persistence of prior displacement. Once customers adopt a competing product, factors such as familiarity, switching costs, and platform-specific preferences further reduce the likelihood of reversion to the original supplier.[15]

15.   Beyond the permanence of individual lost sales, substitution during the pendency of litigation can alter the competitive baseline against which future market interactions occur. From an economic perspective, competition in these markets is dynamic: market share influences dealer attention, product visibility, and customer expectations regarding which

---

[15] Bronnenberg, Bart J., and Jean-Pierre Dube, "The Formation of Consumer Brand Preferences," NBER Working Paper Series (2016) ("Brand experiences early in life have persistent effects on a consumer's brand choice behavior throughout her lifetime. … Consequently, consumers often consider only a small subset of the available products."), available at https://www.nber.org/system/files/working_papers/w22691/w22691.pdf, accessed May 20, 2026.

14

~~FILED UNDER SEAL~~

products are likely to remain available and supported. As substitution persists, these factors interact in a reinforcing manner, whereby increased adoption of a competing product leads to greater visibility and channel support, which in turn facilitates further adoption. As a result, these effects can compound over time, reshaping the incumbent's competitive position even if the legal outcome later favors the incumbent.

16. These dynamics are particularly important where a market becomes commercially viable only after the resolution of regulatory or legal constraints. In such settings, early sales in the post-uncertainty[16] period can establish baseline pricing, dealer relationships, and customer expectations that influence long-term market structure.[17] Suppliers that capture demand during this formative period may benefit from default positioning with dealers and consumers.[18] For example, a dealer that invests in training, compliance processes, and inventory for a particular product may rationally standardize on that supplier, creating de facto lock-in even in the absence of formal exclusivity.[19] Record materials indicate that Plaintiffs were unable to sell Rare Breed FRT® products or enforce associated patents from approximately 2021 through May 2025 due to federal enforcement action, and that the May

---

[16] I understand a May 2025 settlement between the Department of Justice and Plaintiffs resolved litigation associated with Rare Breed practice and enforcement of the Asserted Patents. *See* "Department of Justice Announces Settlement of Litigation Between the Federal Government and Rare Breed Triggers," Office of Public Affairs Press Release, U.S. Department of Justice, May 16, 2025 ("The settlement includes agreed-upon conditions that significantly advance public safety with respect to FRTs, including that Rare Breed will not develop or design FRTs for use in any pistol and will enforce its patents to prevent infringement that could threaten public safety."), available at https://www.justice.gov/opa/pr/department-justice-announces-settlement-litigation-between-federal-government-and-rare-breed, accessed May 20, 2026.

[17] David, Paul A., "Clio and the Economics of QWERTY," *American Economic Review* 75, no. 2 (1985): 332-337, at 332 ("...it is sometimes not possible to uncover the logic (or illogic) of the world around us except by understanding how it got that way. A *path-dependent* sequence of economic changes is one of which important influences upon the eventual outcome can be exerted by temporally remote events, including happenings dominated by chance elements rather than systematic forces."), available at https://www.jstor.org/stable/1805621, accessed May 20, 2026.

[18] *See*, for example, Zachary, Miles A. et al., "Entry Timing: Enduring Lessons and Future," *Journal of Management* 41, no. 5: 1388-1415, at abstract ("Entry decisions—often critical to firm survival and growth, market evolution, and industry profitability—have been the subject of inquiry for decades[, and]...research confirms that entry timing is critical"), available at https://doi.org/10.1177/0149206314563982, accessed May 20, 2026.

[19] Lazzarini, Sérgio G., et al., "The Normative Core of Relational Stakeholder Strategies: Explaining Open Buyer-Supplier Relations in the Context of the Amazon Rainforest," *Business Ethics Quarterly* (2025): 1-43, at 5 ("Scholars examining supplier relations have emphasized that...relationship-specific investments enhance long-term cooperation benefits and create unique rents accruing to the exchange partners"), available at https://www.cambridge.org/core/journals/business-ethics-quarterly/article/normative-core-of-relational-stakeholder-strategies-explaining-open-buyersupplier-relations-in-the-context-of-the-amazon-rainforest/30828954277DDF4070BA806942B051D6, accessed May 20, 2026.

FILED UNDER SEAL

2025 settlement cleared the path for lawful commercial sales.[20] Accordingly, the period following that resolution represents a limited and time-sensitive opportunity for the patentee to establish its market position, and displacement during that period reduces or eliminates the practical ability to realize that exclusivity.

17.    Accordingly, in the context of durable goods sold in a constrained or specialized market, ongoing substitution during litigation creates cumulative economic harm that extends beyond any individual lost transaction. Even if monetary damages could later be estimated for certain observed sales, such damages would not restore the competitive conditions that existed prior to displacement. The harm arises from changes in customer behavior, dealer relationships, and market expectations that evolve over time and cannot be reconstructed with sufficient reliability to restore the but-for competitive position that would have existed absent the alleged conduct. This dynamic erosion of competitive position provides an economic basis for concluding that monetary relief alone would be insufficient to prevent lasting harm during the pendency of the case. These effects are consistent with well-established economic principles governing durable goods markets and dynamic competition.

### B.  Lost Lead Time and Market Exclusivity

18.    From an economic perspective, a patent creates value not only by protecting a stream of individual sales, but also by securing a time-limited appropriability window during which the innovator can translate invention into durable market position.[21] During this period, early entrants can establish complementary assets and other sources of competitive advantage, including pricing expectations, customer and dealer relationships, operating scale, brand identity, and informational advantages, that become materially more difficult for later

---

[20] DeMonico Declaration, ¶¶ 11-17. *See also* "Department of Justice Announces Settlement of Litigation Between the Federal Government and Rare Breed Triggers," Office of Public Affairs Press Release, U.S. Department of Justice, May 16, 2025, available at https://www.justice.gov/opa/pr/department-justice-announces-settlement-litigation-between-federal-government-and-rare-breed, accessed May 20, 2026; and "Legal Status of Rare Breed Triggers' Forced Reset Triggers - Rarebreed Triggers," Rare Breed Triggers, available at https://rarebreedtriggers.com/legal-status/, accessed May 20, 2026.

[21] *See*, for example, Levin, Richard C. *et al.*, "Appropriating the Returns from Industrial Research and Development," *Brookings Papers on Economic Activity* 3 (1987): 783-832 (explaining that firms need to appropriate returns to justify innovation investment and that a patent confers, in theory, limited-time monopoly appropriability).

FILED UNDER SEAL

entrants to displace once formed.[22] Those advantages arise through recognized mechanisms such as technological leadership, switching costs among buyers and intermediaries, and the tendency of the innovating product to become the reference point against which later offerings are evaluated.[23] In that sense, the lead time afforded by patent protection is itself a distinct economic asset, the value of which depends on the ability to operate without direct competition during the market's formative period.

19.    These dynamics are especially important where a product category becomes commercially viable only after the resolution of regulatory or legal uncertainty, as with the market for resetting trigger products following the DOJ settlement.[24] In such settings, innovators may incur the costs and risks associated with developing and sustaining the product category during periods of uncertainty, while later entrants are able to participate once those constraints are reduced or resolved.[25] I understand that the market for resetting trigger products developed under evolving regulatory and legal conditions, and that competing products were offered during or following periods in which Plaintiffs' ability to

---

[22] *See*, for example, Teece, David, "Profiting from Technological Innovation: Implications for Integration, Collaboration, Licensing and Public Policy," *Research Policy* 15, no. 6 (1986): 285-305, at abstract ("[W]hen imitation is easy, markets don't work well, and the profits from innovation may accrue to the owners of certain complementary assets, rather than to the developers of the intellectual property. This speaks to the need, in certain cases, for the innovating firm to establish a prior position in these complementary assets[.]").

[23] *See* Kerin, Roger A., Rajan P. Varadarajan, and Robert A. Peterson, "First-Mover Advantage: A Synthesis, Conceptual Framework, and Research Propositions," *Journal of Marketing* 56, no. 4 (1992): 33-52, at 33, 42-46 (describing first-mover mechanisms including preemption, switching costs, reputational effects, specialized asset investments by intermediaries and end users, and entrenching first-mover advantages); Robinson, William T., Gurumurthy Kalyanaram, and Glen L. Urban, "First-Mover Advantages from Pioneering New Markets: A Survey of Empirical Evidence," *Review of Industrial Organization* 9, no. 1 (1994): 1-23 (surveying evidence that pioneers can shape preferences, maintain durable share advantages, and benefit from longer lead time).

[24] *See*, for example, Stern, Ariel Dora, "Innovation under Regulatory Uncertainty: Evidence from Medical Technology," *Journal of Public Economics* 145 (2017): 181-200 (finding that innovator entrants in medical-device markets spent 34 percent or 7.2 months longer in regulatory approval and that those delays were economically material, and that clearer regulatory guidance reduced approval times).

[25] *See* Stern, Ariel Dora, "Innovation under Regulatory Uncertainty: Evidence from Medical Technology," *Journal of Public Economics* 145 (2017): 181-200. *See also* Musquera, Anna Vinals and Scott Babwah Brennen, "Regulatory uncertainty is what actually holds back innovation," Brookings ("While the overall effects of regulation are complex, one of the clearest and most consistent findings is that regulatory uncertainty discourages investment and innovation....Unpredictability increases perceived risk and often encourages a wait-and-see approach. ...When businesses can anticipate compliance costs and timelines, they invest more readily in new products and markets. Unpredictable enforcement or changing rules raise financing costs..."), available at https://www.brookings.edu/articles/regulatory-uncertainty-is-what-actually-holds-back-innovation/, accessed May 26, 2026.

17

FILED UNDER SEAL

commercially exploit and enforce their technological patents were constrained.[26] Accordingly, the initial period following the resolution of those constraints represents a limited and non-recurring opportunity for the patentee to establish its market position. Competitive entry during that period does more than divert contemporaneous sales; it reduces or eliminates the practical ability to realize that exclusivity window. Once that period has passed, monetary damages may estimate certain lost sales, but they cannot recreate the lost period of exclusivity or the associated opportunity to establish first-mover advantages and market structure.

### C.  Distribution and Channel Disruption

20.    In specialized product markets, manufacturers often rely on a limited number of distributors and dealers to reach end customers.[27,28] These distribution channels are not merely conduits for price transmission; they are integral to a supplier's competitive position. Intermediaries make product-specific investments in inventory, training, customer support, compliance, and marketing. When competing products are introduced, particularly at materially different price points or with similar functionality, dealers face economic incentives to reallocate these investments toward products that are expected to generate higher sales velocity or lower perceived risk. Economic research on switching costs and network effects shows that once intermediaries adopt a competing product, these investments, combined with coordination

---

[26] DeMonico Declaration, ¶¶ 11-17 (discussing challenges to the resetting trigger product category's legality).

[27] I understand that Rare Breed has to date self-distributed its products directly to customers through its website. *See* DeMonico Declaration, ¶ 71; *see also* "Frequently Asked Questions - Rarebreed Triggers," available at https://rarebreedtriggers.com/faqs/, accessed May 20, 2026.

I also understand that Rare Breed is currently developing a formal dealer program in response to competing products entering the market. *See* DeMonico Declaration, ¶¶ 71, 77.

[28] *See* "7 Types of Distributors (Plus Considerations for Choosing One)," Indeed, December 11, 2025 ("Exclusive distribution is the approach of using limited sales outlets only available in specific locations or stores with the mindset of creating rarity and exclusivity of an item or brand. It is most common for marketing and distributing luxury brands, though a variety of brands and products use exclusive distributors sometimes. ... Exclusive distribution deals allow greater control over contract negotiations, rates and product distribution because fewer entities are involved."), available at https://www.indeed.com/career-advice/career-development/types-of-distributors, accessed May 20, 2026.

FILED UNDER SEAL

effects, can make such shifts persistent and difficult to reverse, because dealers and resellers face both economic and operational costs when switching back.[29]

21.    Dealers who adopt a competing product may reorganize core aspects of their business around that product, including inventory management, sales processes, marketing efforts, and staff training. Distributors may likewise commit to product-specific inventory positions, supplier relationships, and compliance frameworks that determine which products are broadly available in the market. Once these investments are made, they are not readily transferable. As a result, even if a competing product is later removed from the market, intermediaries may not revert to the original supplier because doing so would require reinvestment, operational disruption, and renewed uncertainty regarding product continuity. Competitive displacement at the distribution level can therefore persist independently of the underlying legal outcome. More broadly, the presence of competing products may require the incumbent to adjust its distribution strategy, including changes in timing, structure, or margin expectations, reflecting the economic pressure imposed by competitive entry.

22.    The industrial organization literature recognizes that switching costs and relationship-specific investments can create durable changes in market structure. In the market for firearm trigger mechanisms, distributors and dealers incur sunk, product-specific costs tied to particular designs and suppliers, including inventory commitments, product training, marketing materials, customer education, and diligence relating to legal and regulatory exposure.[30] When a competing product displaces the patented product in dealer channels, intermediaries may reallocate shelf space, promotional effort, and customer guidance toward

---

[29] Farrell, Joseph and Paul Klemperer, "Coordination and Lock-In: Competition with Switching Costs and Network Effects," Working Paper (2006) ("Switching costs and network effects bind customers to vendors if products are incompatible, locking customers or even markets in to early choices."), available at https://www.nuff.ox.ac.uk/economics/papers/2006/w7/Farrell_KlempererWP.pdf, accessed May 20, 2026.

[30] *See*, for example, Coate, Malcolm B. and Mark R. Fratrik, "Dual Distribution as a Vertical Control Device," FTC Bureau of Economics Working Paper No. 143 (1986), p. 12 ("By using independent[] [distributors], a new firm can sell its product without a heavy investment in distribution-assets. This strategy serves to reduce sunk costs, because a new firm would not have to invest in industry-specific distribution capital that it might not be able to salvage it the entry failed."), available at https://www.ftc.gov/sites/default/files/documents/reports/dual-distribution-vertical-control-device/wp143.pdf, accessed May 26, 2026.

~~FILED UNDER SEAL~~

the competing product. These investments create economic frictions that make subsequent reversion less likely, even if the competing product is no longer available.

23. From an economic perspective, displacement within distribution channels has effects that extend beyond immediate sales. Dealers and distributors influence which products are visible, recommended, and readily available to customers. When channel partners shift their focus toward a competing product, they alter the set of products that consumers meaningfully consider. This can reduce the incumbent's effective market presence, independent of underlying product quality or legal status. Because these effects operate through coordinated changes in dealer behavior rather than isolated transactions, they are not fully observable in transaction-level data and cannot be readily reversed through monetary compensation.

24. .[31] This is a concrete example of the channel disruption that patentees can face from competitors with alleged infringing products. While this example reflects a specific instance, it is economically consistent with the incentives faced by dealers in this market, where carrying competing products with overlapping functionality and different pricing structures creates pressure to prioritize one supplier over another. Rare Breed's experience illustrates how the presence of competing products can hinder current or future adoption of the patented product in intermediated distribution channels, in addition to diverting sales in direct-to-consumer channels. I further understand that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[32]

### D. Price Erosion and Reference Pricing Effects

25. Entry of a competing product can exert downward pressure on prices, particularly in markets where pricing is transparent and readily observed by customers and intermediaries. In such

---

[31] DeMonico Declaration, ¶ 72.

[32] DeMonico Declaration, ¶¶ 71, 77.

20

FILED UNDER SEAL

environments, price becomes a reference point, a benchmark against which future transactions are evaluated. When a competing product is introduced at a materially lower price, that lower price can anchor expectations among both dealers and end customers.[33] As a result, the incumbent may lose market share to the extent that price differences divert demand, particularly where those differences are not perceived as reflecting differences in quality or reliability. The DeMonico Declaration indicates that competing products in the resetting trigger product category have been offered at substantially lower price points than Plaintiffs' products, creating the conditions under which such reference pricing effects would be expected to arise and would be expected to persist so long as competing products offering similar functionality remain available at materially lower price points.[34] I further understand that Rare Breed reduced the retail price of the FRT-15L3® from $499 to $450 in response to the influx of competing infringing products.[35]

26.    This phenomenon, commonly referred to as price erosion, can have durable effects on a firm's pricing power, that is, its ability to sustain higher prices in subsequent transactions. Once buyers internalize a lower reference price, efforts by the incumbent to restore prior price levels may result in lost sales. Moreover, attempts to increase prices following the resolution of litigation may be perceived as opportunistic or unjustified, which can further weaken the firm's market position. Economic studies of price behavior emphasize that price erosion can create persistent pricing benchmarks, particularly in markets characterized by transparent pricing and repeated transactions, thereby constraining pricing not only in current transactions but in future periods as well.[36]

---

[33] Nagle, Thomas T. and Georg Müller, *The Strategy and Tactics of Pricing,* 6th ed. (New York: Routledge, 2018), p. 19 ("In the terminology of economics, good [pricing] policies enable prices to change along the demand curve without changing expectations in ways that cause the demand elasticity to 'shift' adversely for future purchases.").

[34] DeMonico Declaration, ¶¶ 61-62 (discussing pricing of the Accused Products in the range of $80 to $270, other infringing products for as little as $10-$20, and public discussion of these products' steep discounts compared to Rare Breed's pricing).

[35] DeMonico Declaration, ¶ 61.

[36] *See,* for example, Funaki, Yukihiko, et al., "Price stickiness and strategic uncertainty: An experimental study," *Journal of Economic Dynamics and Control* 180 (2025), at abstract ("We find persistent price stickiness when prices are strategic complements and fully anticipated shocks lower the equilibrium price.").

FILED UNDER SEAL

27.    The presence of a lower-priced competing product does not necessarily reflect greater productivity. Where the patentee has already incurred substantial sunk costs to develop, test, commercialize, and bring a product to market, including overcoming regulatory constraints and establishing demand, a subsequent entrant that adopts an infringing design may be able to undercut price by avoiding those fixed investments. Economists have long recognized this as an appropriability or free-riding problem: when innovators cannot recover their upfront investments because rivals can copy and compete before those costs are recouped, incentives to innovate are weakened.[37] When barriers to infringing entry are low, the economic returns from innovation may be diverted to imitators rather than the innovator,[38] and in such circumstances, observed price differences may reflect differences in cost recovery rather than differences in underlying efficiency, meaning that lower prices do not necessarily indicate more efficient production, but rather the erosion of the innovator's ability to appropriate returns from its investment.

28.    This dynamic exacerbates price erosion. The patentee is effectively required to compete against prices that do not incorporate the sunk costs of innovation and commercialization that patent protection is intended, in part, to allow the innovator to recover. In the context of the Accused Products, which are offered at substantial discounts relative to Plaintiffs' FRT® products, the resulting price pressure can be immediate and significant. Once lower prices become established in the market, they function as reference points that influence future pricing negotiations and purchasing decisions, altering the economic conditions under which subsequent transactions occur. As a result, the impact of such price pressure extends beyond contemporaneous sales and affects the structure of future pricing in the market.

29.    From an economic standpoint, even temporary price reductions triggered by the presence of a competing product can have long-term consequences if they alter buyer expectations and bargaining behavior. These effects reflect structural changes in how products are valued and

---

[37] *See*, for example, Levin, Richard C. et al., "Appropriating Returns from Industrial Research and Development," *Brookings Papers on Economic Activity* 3 (1987): 783-832 (explaining that firms need to appropriate returns to justify innovation investment and that a patent confers, in theory, limited-time monopoly appropriability).

[38] *See* Teece, David, "Profiting from Technological Innovation: Implications for Integration, Collaboration, Licensing and Public Policy," *Research Policy* 15, no. 6 (1986): 285-305, at 285 ("[W]hen imitation is easy, markets don't work well, and the profits from innovation may accrue to the owners of certain complementary assets, rather than to the developers of the intellectual property.").

~~FILED UNDER SEAL~~

priced, rather than isolated transactional discounts. Once lower prices become embedded as reference points, subsequent transactions tend to be negotiated around those expectations, making it difficult to return to prior price levels. Although monetary relief may estimate lost profits based on observed pricing, it does not restore the pricing expectations or competitive conditions that would have supported higher prices in the absence of the alleged conduct. As a result, the relevant counterfactual is not limited to a set of lost transactions, but includes a different pricing equilibrium that cannot be recreated through retrospective compensation. These effects operate through changes in expectations and bargaining dynamics, which are not directly observable in market data and cannot be reconstructed with sufficient reliability to replicate the but-for pricing environment.

### E.  Economic Effects of Market Confusion and Perceived Product Legitimacy

30.    In differentiated niche markets, customer and dealer perceptions regarding product source, legitimacy, and reliability can influence purchasing behavior independently of price. Where multiple competing products are offered with overlapping functionality and similar outward characteristics, market participants may become uncertain regarding which products represent the original innovating product, which products are authorized or supported by the original developer, or whether meaningful technological differences exist among competing offerings. Economic research recognizes that such perceptions can influence product differentiation, willingness to pay, and future purchasing behavior.[39]

31.    I understand that Plaintiffs contend they pioneered commercially available FRT® products and invested substantial resources in developing, commercializing, and defending the technology at issue.[40] I further understand that publicly available commentary and market discussions have, at times, attributed innovations associated with Plaintiffs' products to

---

[39] *See*, for example, Anderson, J. Jonas, "Nontechnical Disclosure," *Vanderbilt Law Review* 69, no. 6 (2016):1573-1602, at 1594 ("Obtaining (and advertising) one's patent informs the world that what one has done is innovative/well-made/sexy."), available at https://cdn.vanderbilt.edu/vu-wp0/wp-content/uploads/sites/89/2016/11/30103806/Nontechnical-Disclosure.pdf, accessed May 20, 2026; Billy, Alexander and Neel Sukhatme, "Perception Pending: What Do Patents Signal to Consumers?" *Journal of Empirical Legal Studies* 22, no. 2 (2025): 163-184, at 163 ("In an online randomized experiment, we demonstrate how increasing the salience of patent status heightens consumers' beliefs that products are innovative and well made."), available at https://repository.law.umich.edu/facarticles/3111/, accessed May 20, 2026.

[40] DeMonico Declaration, ¶ 7-24.

23

~~FILED UNDER SEAL~~

competing products or questioned whether Plaintiffs' newer products were derived from competing designs.[41] From an economic perspective, this type of confusion may weaken the incumbent supplier's differentiation and innovator identity within the market. In specialized enthusiast markets, where purchasing decisions are influenced in part by perceived product origin, reputation, and technological leadership, such effects can influence customer preferences, dealer recommendations, and willingness to pay.

32.    These effects are difficult to isolate and quantify with precision because they operate through expectations and perceptions rather than directly observable transactions. Although some resulting economic effects may ultimately appear in sales or pricing data, the underlying impact on customer perception, dealer behavior, and product positioning cannot be directly measured or fully reconstructed after the fact.[42] As a result, from an economic perspective, monetary damages may not fully capture the effects of ongoing market confusion and erosion of product differentiation during the pendency of the litigation.

### F.    Enforcement Signaling and Cascading Competitive Entry

33.    The timing and perceived effectiveness of patent enforcement can influence the behavior of current and prospective market participants.[43] From an economic perspective, firms update their expectations about the costs and risks of entry based on observable outcomes, including whether alleged infringers are able to continue selling during litigation. In markets with relatively low barriers to entry, the continued presence of competing products despite the assertion of intellectual property rights may signal that entry is feasible and that the expected

---

[41] DeMonico Declaration, ¶¶ 44-45, 68, and Exhibit U.

[42] *See*, for example, Šostar, Marko and Vladimir Ristanović, "Assessment of Influencing Factors on Consumer Behavior using the AHP Model," *Sustainability* 15, no. 13 (2023): 1-24, at 1-2, 19 ("Consumer habits are changing each day due to a complex interplay of technological, economic, social, cultural, environmental, and health and safety factors. ...Consumer habits are greatly influenced by internal and external factors. ...[I]t is difficult to predict exactly how consumers will behave in all situations....The main limitation in assessing the impact on consumer behavior stems from the large number of impacts that are difficult to measure. Even those impacts that can be measured are not always comparable, such as emotions, feelings, belonging, acceptance, etc."), available at https://www.mdpi.com/2071-1050/15/13/10341, accessed May 26, 2026.

[43] Milgrom, Paul and John Roberts, "Predation, Reputation, and Entry Deterrence," *Journal of Economic Theory* 27, no. 2 (1982): 280-312, at 280 ("Our game-theoretic, equilibrium analysis suggests that if a firm is threatened by several potential entrants, then predation may be rational against early entrants, even if it is costly when viewed in isolation, because it yields a reputation which deters other entrants.").

24

~~FILED UNDER SEAL~~

cost of participation is limited or delayed, thereby increasing the likelihood of additional entry.

34.    This signaling effect can be particularly pronounced where the means of entry are readily available and observable. Where product designs, configurations, or functional approaches are accessible in the marketplace, potential entrants may be able to develop and offer competing products with relatively limited upfront investment. I understand from counsel and publicly available materials that Defendant Hoffman Tactical LLC publicly released design files relating to Super Safety products, and that such materials have been widely disseminated.[44] Record materials and information provided by counsel indicate that publicly available design files, together with low-cost production technologies, have facilitated entry by a substantial number of third parties into the market for resetting triggers and related products.[45] Publicly available materials further indicate that certain of the Defendants' products are described as being based on a Hoffman Tactical LLC design.[46] In economic terms, the availability and use of such designs can reduce both technical and financial barriers to entry by lowering development costs and accelerating product introduction. Observed market outcomes, including the extent to which incumbent firms can restrict competing sales, can influence the expectations and behavior of additional potential entrants.[47]

---

[44] *See* "Super Safety – Hoffman Tactical," Hoffman Tactical LLC, available at https://hoffmantactical.com/designs/super-safety/, accessed May 20, 2026. It appears sales and downloads of the designs are currently suspended due to a preliminary injunction.

[45] DeMonico Declaration, ¶ 58 ("By the time Rare Breed settled with the DOJ in May 2025, we had identified approximately seventy companies selling infringing reset trigger products. The majority of those infringers were selling products derived from design files that Defendant Hoffman Tactical had released publicly for free download."). *See also* Milgrom, Paul, and John Roberts, "Predation, Reputation, and Entry Deterrence," *Journal of Economic Theory* 27, no. 2 (1982): 280-312, at 280 ("Asymmetric information plays a crucial role in our analysis, since it provides the rationale for entrants to base their expectations of the firm's future behavior on its past actions.").

[46] Record materials and information provided by counsel indicate that DNT, Polymer Pew, and Z3 employ Hoffman Tactical LLC designs. See *ABC IP, LLC and Rare Breed Triggers, Inc., v. Timothy Hoffman and Hoffman Tactical LLC*, Memorandum, February 11, 2026, ¶ 15.

[47] *See*, for example, Quinn, Gene, "The theory of patents and why strong patents benefit consumers," IPWatchdog, November 24, 2025 ("The truth is consumers benefit most when patents are strongest and act to block actors. When competitors are blocked that means they cannot simply copy and flood the market with knock-offs or products that at their core are essentially identical. ...Strong patents do not deter innovators, but rather strong

25

FILED UNDER SEAL

35.    Once such entry incentives are present, they can give rise to additional entry over time, as evidenced by the circumstances of this multi-district litigation. Additional entrants may capture portions of demand, intensify substitution away from the patentee's product, contribute to price erosion, and further affect distribution channels and customer relationships. The economic significance of low entry barriers lies not merely in whether entry is possible, but in how quickly entry may affect prices, margins, and market position.[48] In markets where entry barriers are low, these effects may be cumulative and path-dependent: lost sales may become dispersed across multiple sellers, price expectations may adjust downward, and competitive displacement becomes progressively more entrenched over time. As a result, the structure of competition can shift from a concentrated market to one characterized by fragmented supply and dispersed sales, further complicating the relationship between observed outcomes and the but-for market.

36.    These dynamics also make the resulting effects more difficult to address through monetary relief. As the number of competing sellers increases, the but-for allocation of sales, margins, customer relationships, and channel effects becomes increasingly diffuse and less observable. Lost sales and competitive effects are no longer attributable to a single source, but instead become dispersed across multiple firms, products, and distribution channels. In economic terms, this creates a multi-firm attribution problem in which observed market outcomes reflect the combined influence of numerous participants rather than any single actor. As a result, even with detailed data, it may not be possible to reliably reconstruct the but-for market outcome or isolate the effects attributable to any individual source of competition. These difficulties become more pronounced as additional sellers enter the market and competitive effects become increasingly fragmented across the broader market structure.

37.    Accordingly, from an economic perspective, the risk of continued or additional entry during the pendency of litigation can contribute to cumulative and self-reinforcing competitive

---

patents inspire innovators to innovate in more grandiose ways."), available at https://ipwatchdog.com/2015/11/24/theory-patents-strong-patents-benefit-consumers/, accessed May 20, 2026.

[48] *See* Carlton, Dennis W., "Barriers to Entry," *Issues in Competition Law and Policy* 1 (2008): 601-617, at 601 ("The more interesting and relevant questions are how fast entry or exit will erode profits or losses, and how do the bounds that entry and exit place on price vary with uncertainty and sunk cost.").

~~FILED UNDER SEAL~~

effects that are difficult to reverse. As additional sellers enter and sales become dispersed across multiple participants, changes in market share, pricing, and channel behavior reflect the combined influence of multiple entrants rather than any single firm. Because these effects arise from coordinated and overlapping changes in behavior across market participants, they are not fully captured by firm-specific monetary damages and may persist even after the resolution of the underlying dispute.

## IV.    Reputational Harm

38.    Reputational harm in differentiated niche markets can have meaningful economic consequences for market participants. In such markets, dealers and end consumers consider not only price and product functionality, but also brand identity and perceived legitimacy when making purchasing decisions. When a product becomes associated with uncertainty or adverse signals regarding reliability or legitimacy, those effects may extend beyond the individual product to the supplier's broader product line or brand.[49] From an economic perspective, this can reduce demand not only for the product at issue, but also for related offerings that share technological, brand, or distributional associations.

39.    Economists describe this phenomenon as reputational spillover, in which signals associated with one product affect expectations regarding related products or the firm as a whole. In a competitive setting, such spillover alters the information environment facing dealers and consumers, leading them to update expectations regarding quality, reliability, and risk. Because these expectations influence future purchasing decisions, reputational harm is inherently path-dependent: once expectations are revised downward, they may not be fully restored even if the underlying source of uncertainty is later resolved.[50]

40.    These effects are particularly relevant in markets for differentiated or premium products, where perceived quality and legitimacy are central to value.[51] Economic research on

---

[49] *See*, for example, DeMonico Declaration, ¶¶ 42-44 (describing public opposition to Rare Breed's products, including calls for boycotts, associated with Plaintiffs' patent enforcement efforts).

[50] *See* Jia, Justin, Jia Li, and Weixin Liu, "Expectation-based consumer purchase decisions: behavioral modeling and observations," *Marketing Letters* (2022): 1-17, at abstract ("Expectations play important roles in consumers' purchase decisions."), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9676804/, accessed May 20, 2026.

[51] I understand Rare Breed positions its FRT® products as premium products. DeMonico Declaration, ¶ 60.

FILED UNDER SEAL

reputational capital shows that trust and perceived reliability are key determinants of willingness to pay and access to distribution channels.[52] Firms with strong reputational capital may benefit from greater pricing flexibility and channel support, while those experiencing adverse reputational effects may face reduced demand and more limited market access.

41.    From an economic perspective, reputational effects are difficult to quantify precisely because they operate through expectations, perceptions, and relationships that are not directly observable in transaction-level data. Although these effects ultimately influence revenues, they do so indirectly, through changes in perceived risk, product differentiation, and purchasing behavior. As a result, even where some aspects of economic harm can be measured, the portion attributable to reputational effects cannot be isolated with sufficient reliability to fully reconstruct the but-for demand conditions.

42.    Reputational effects may also interact with other mechanisms described above. For example, reduced perceived differentiation may contribute to price erosion, while lower observed prices may in turn signal reduced product quality or value.[53] Similarly, changes in perceived legitimacy or reliability may influence dealer recommendations and product visibility within distribution channels.[54] These interactions can reinforce one another over time, contributing

---

[52] Rindova, Violina P. et al., "Being Good or Being Known: An Empirical Examination of the Dimensions, Antecedents, and Consequences of Organizational Reputation," *Academic of Management Journal* 48, no. 6 (2005): 1033-1049, at 1033 ("The concept of reputation, defined as stakeholders' perceptions about an organization's ability to create value relative to competitors, has received considerable attention from organizational scholars [and]...research has demonstrated unambiguously that a favorable organizational reputation is associated with economic benefits.").

[53] *See* National Research Council, *Reference Manual on Scientific Evidence*, 3rd ed. (Washington, DC: The National Academies Press, 2011), p. 441 ("Price erosion is a common issue in quantifying intellectual property damages. However, price erosion may be an issue in many other commercial disputes. For example, a plaintiff may argue that the disparagement of its product due to false advertising has eroded the product's price."), and fn. 26, citing *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081 (7th Cir. 1994) ("finding that the plaintiff's damages only consisted of lost profits before consideration of price erosion, prejudgment interest, and costs due to the presence of other competitors who would keep prices low"), available at https://www.fjc.gov/sites/default/files/materials/21/SciMan3D01.pdf, accessed May 20, 2026.

[54] *See* "Price Erosion: What Is It, and How Do You Stop It?" GreyScout, February 13, 2024 ("Naturally, consumers enjoy steeply discounted brand-name products. However, while low prices can be great for consumers, they can damage a brand's reputation and how the market perceives its products."), available at https://greyscout.com/price-erosion-what-is-it-and-how-do-you-stop-it/, accessed May 20, 2026. *See also* Langer, Daniel, "Luxury Unfiltered: The true cost of cutting luxury prices," Luxury Daily, September 11, 2024 ("A key principle in luxury is that perceived value is far more important than actual value. The minute a brand offers a

FILED UNDER SEAL

to cumulative changes in demand and competitive positioning. As discussed above, record materials indicate that Rare Breed may be experiencing such effects, including the influence of lower-priced alternatives on perceived value and questions regarding innovator status.[55]

43.    Accordingly, from an economic perspective, reputational effects can contribute to changes in market outcomes that are not fully captured through observed price or sales data alone. Because these effects operate through expectations and relationships that evolve over time, they are not directly observable and are difficult to be reliably reconstructed after the fact. As a result, even when monetary damages are estimated, they may not fully reflect the economic impact associated with changes in reputation and market perception, nor restore the demand conditions that would have existed absent those effects.

## V.    Asymmetric Economic Impact of an Injunction

44.    From an economic perspective, the relative impact of granting or denying a preliminary injunction depends on the nature of the parties' respective investments. Where the patentee has made substantial expenditures to develop, commercialize, and support the patented product or product market, and those expenditures are largely sunk, that is, not readily recoverable or redeployable, continued competitive displacement in the absence of injunctive relief can result in losses that are difficult to reverse.[56] I understand that Plaintiffs incurred substantial research and development and regulatory-related expenditures in connection with the development and commercialization of their FRT® products, and that these expenditures are largely sunk.[57] By contrast, where another party's activities involve products or offerings that can be modified, discontinued, or redirected, the economic impact of an injunction may be more limited because those activities are more readily adjusted in

---

discount, it sends a signal that the original price was inflated or unjustified."), available at https://www.luxurydaily.com/luxury-unfiltered-the-true-cost-of-cutting-luxury-prices/, accessed May 20, 2026.

[55] *See* discussion at Sections III.D and III.F of this declaration.

[56] *See*, for example, Pindyck, Robert S., "Irreversibility, Uncertainty, and Investment," *Journal of Economic Literature* 29, no. 3 (1991): 1110-1148, at 1111 ("What makes an investment expenditure a sunk cost and thus irreversible? Usually it is the fact that the capital is firm or industry specific, that is, it cannot be used productively by a different firm or in a different industry.").

[57] DeMonico Declaration, ¶¶ 7-17 (discussing resources invested in developing and defending the FRT® product category).

~~FILED UNDER SEAL~~

response to changing conditions. Economic theory distinguishes between losses associated with irreversible, market-specific investment and those associated with more redeployable business activity, with the former generally being more persistent and more difficult to unwind.[58]

45.    The economic comparison is also informed by the timing and nature of reliance. Where a party continues to expand or maintain market activity after becoming aware of a potential dispute, the associated reliance reflects a decision to proceed under conditions of known or increasing uncertainty. I understand that Defendants continued selling the Accused Products after receiving a cease-and-desist letter in August 2025 and after a preliminary injunction was entered against Timothy Hoffman and Hoffman Tactical LLC in similar litigation in February 2026.[59] From an economic standpoint, such ex post reliance differs from earlier investments made to develop products, establish market presence, and create demand under conditions of greater uncertainty.[60] These distinctions are relevant because they affect the extent to which economic losses are likely to persist or be mitigated over time.

---

[58] *See* for example, Kim, Hyunseaob and Howard Kung, "Asset Redeployability, Economic Uncertainty, and Corporate Investment," Working Paper (2013): 1-47, at 24 ("Consistent with the theories of irreversible investment under uncertainty, we find that firms with less redeployable assets experience a significantly larger drop in investment than firms with more redeployable assets in response to an increase in aggregate uncertainty."), available at https://pages.stern.nyu.edu/~agavazza/kim3.pdf, accessed May 20, 2026. *See also* Pindyck, Robert S., "Irreversibility, Uncertainty, and Investment," *Journal of Economic Literature* 29, no. 3 (1991): 1110-1148.

[59] DeMonico Declaration, ¶ 38. See also *ABC IP, LLC and Rare Breed Triggers, Inc., v. Timothy Hoffman and Hoffman Tactical LLC*, Preliminary Injunction, February 11, 2026; *ABC IP, LLC and Rare Breed Triggers, Inc., v. Timothy Hoffman and Hoffman Tactical LLC*, Memorandum, February 11, 2026, at § IV ("the Court will GRANT Plaintiffs' motion for a preliminary injunction (Doc. 14) and continue the injunction bond of $20,000."). I understand the litigation in which the preliminary injunction against Mr. Hoffman and Hoffman Tactical LLC was granted has also been consolidated in this MDL.

[60] *See*, for example, Bebchuk, Lucian A., "Property Rights and Liability Rules: The Ex Ante View of the Cathedral," *Michigan Law Review* 100, no. 3 (2001): 601-639, at 603 ("The ex post analysis [] examines which allocation of entitlements would most likely facilitate the efficient outcome in a world where such obstacles to bargaining exist. ...[The ex ante analysis considers] those decisions that (i) take place before decisions whether to undertake externality-producing actions are made, and (ii) influence the parties' potential payoffs"); Calabresi, Guido and A. Douglas Melamed, "Property Rules, Liability Rules, and Inalienability: One View of the Cathedral," *Harvard Law Review* 85, no. 6 (1972): 1089-1128, at 1092 ("An entitlement is protected by a property rule to the extent that someone who wishes to remove the entitlement from its holder must buy it from him in a voluntary transaction in which the value of the entitlement is agreed upon by the seller. ...Whenever someone may destroy the initial entitlement if he is willing to pay an objectively determined value for it, an entitlement is protected by a liability rule").

FILED UNDER SEAL

46.    Finally, the relative effects of granting or denying injunctive relief depend on the extent to which the parties' respective losses differ in reversibility. Where continued sales allow for ongoing erosion in market share, pricing, and customer relationships, those effects may accumulate over time and become increasingly difficult to reverse.[61] These effects can be particularly significant for a non-diversified firm whose business is concentrated in the affected product category.[62] By contrast, the effects of an injunction that limits specific product offerings may be more readily contained where business activities can be adjusted or redirected. From an economic perspective, losses associated with cumulative changes in market position are more persistent than losses associated with foregone sales that can be mitigated or redirected. Accordingly, when ongoing market activity leads to structural changes in competitive position, the economic cost of denying injunctive relief may exceed the cost associated with granting it.

## VI.    Inadequacy of Monetary Damages

47.    In many cases, it is not possible to reconstruct with sufficient precision what sales were lost due to substitution, which customers were deterred by perceived uncertainty, or how prices would have evolved absent the alleged conduct. Dynamic markets are shaped by interactions among customers, intermediaries, and competitors over time, making the counterfactual path of demand inherently unobservable. Economists refer to this as the ex post reconstruction problem: because one cannot directly observe the market outcome that would have existed absent the alleged conduct, attempts to attribute specific lost sales or pricing effects

---

[61] *See*, for example, Ogus, Anthony and Louis Visscher, "A Law and Economics Perspective on Injunctive Relief," *Maastricht Journal of European and Comparative Law* 17, no. 1 (2010): 32-47 ("The task for economic analysis is [] to determine whether injunctive relief or damages is preferable in the particular circumstances governing the parties' activities. This largely involves comparing on the one hand the welfare losses which arise from imperfect damages awards which arise predominantly where the court has high information costs in assessing the plaintiff's losses (particularly where those losses are subjective and therefore cannot be determined by reference to market evaluation) or include irrecoverable third-party losses with, on the other hand, the transaction costs of negotiating a compromise solution or the welfare losses arising from a holdout (both conditions are likely where more than two parties are involved).").

[62] *See* discussion of concentration in Plaintiffs' product portfolio and revenue stream at Section VII of this declaration.

31

FILED UNDER SEAL

necessarily involve uncertainty. These limitations are particularly relevant in the context of the pricing, distribution, and market dynamics described above.[63]

48.    Moreover, the economic harm described above, including lost market share, channel disruption, price erosion, and reputational effects, is not purely additive but reflects cumulative and path-dependent changes in market conditions. Each additional period of competition can alter the trajectory of demand, pricing expectations, and dealer behavior in ways that influence subsequent outcomes. As a result, the impact of earlier displacement affects not only contemporaneous losses but also the baseline against which future competitive interactions occur.[64] Even where certain components of harm can be estimated, those estimates do not fully capture the compounding effects of these dynamics or the extent to which prior changes influence future market outcomes.

49.    Where economic effects depend on changes in customer relationships, distribution channels, pricing expectations, or competitive positioning, the analysis necessarily relies on counterfactual assumptions regarding how the market would have evolved absent the alleged conduct. Because those outcomes are not directly observable, the resulting estimates depend on assumptions about customer behavior, dealer responses, and pricing dynamics that cannot be independently verified.[65] As a result, even where quantitative models are employed, the estimates produced are sensitive to underlying assumptions and may not fully capture the true economic impact of the alleged conduct. In particular, changes in expectations,

---

[63] *See*, for example, Healy, Paul M. et al., "Market Competition, Earnings Management, and Persistence in Accounting Profitability Around the World," *Review of Accounting Studies* (2014) ("While our results [for accounting returns mean reversion] are consistent with economic theory, we recognize that it is difficult to attribute causality, especially given various alternative channels that drive competitive forces in an economy (e.g., government regulation)."), available at https://dash.harvard.edu/server/api/core/bitstreams/7312037d-586c-6bd4-e053-0100007fdf3b/content, accessed May 20, 2026.

[64] On path dependence and cumulative effects in economic systems, *see* David, Paul A., "Clio and the Economics of QWERTY," *American Economic Review* 75, no. 2 (1985): 332-337, at 332 ("...it is sometimes not possible to uncover the logic (or illogic) of the world around us except by understanding how it got that way. A *path-dependent* sequence of economic changes is one of which important influences upon the eventual outcome can be exerted by temporally remote events, including happenings dominated by chance elements rather than systematic forces."), available at https://www.jstor.org/stable/1805621, accessed May 20, 2026.

[65] *See*, for example, Bladon, Annabelle Jade, et al., "Developing a frame of reference for fisheries management and conservation interventions," *Fisheries Research* 208 (2018): 296-308, at 296-297 ("[C]ounterfactuals are subject to numerous sources of uncertainty and it can be challenging to develop and validate projected trends when knowledge is poor"), available at https://www.sciencedirect.com/science/article/pii/S0165783618302315, accessed May 20, 2026.

~~FILED UNDER SEAL~~

relationships, and market positioning cannot be directly inferred from observed data, limiting the ability of monetary damages to fully reflect the economic harm.

50. Accordingly, from an economic perspective, the limitations of monetary damages extend beyond challenges in measurement and reconstruction. While damages may provide estimates of certain observed effects, they do not restore the market conditions that would have existed absent the alleged conduct. Where harm arises from changes in expectations, relationships, pricing dynamics, and competitive positioning, those effects alter the structure of the market itself and cannot be fully reversed through retrospective compensation. As a result, monetary damages may be inherently incomplete in addressing the full economic impact of such changes.

51. A further limitation of monetary damages is collectability risk. Even a properly measured damages award may not provide an adequate substitute for interim relief if there is a substantial probability that the accused infringers will be unable to satisfy that award. From an economic perspective, the relevant consideration is the expected value of recovery, which reflects both the magnitude of the award and the likelihood of payment. This risk is particularly salient for newly formed firms with limited operating history, which may lack the retained earnings, asset base, or financing capacity to absorb a substantial adverse judgment. For example, record materials and information provided by counsel indicate that several of the Defendants were formed from 2020 to present and have no publicly available financial information.[66] Where expected liability materially exceeds the economic capacity

---

[66] *See* 80Mills LLC, Articles of Organization (Wyoming Secretary of State, filed January 19, 2024); Deez Nutz Tactical LLC, Certificate of Organization (State of Idaho Secretary of State, filed April 15, 2024); Hanes Tactical LLC, Certificate of Formation (Texas Secretary of State, filed February 11, 2025); Harrison Gunworks LLC, Certificate of Organization (State of Idaho Secretary of State, filed May 30, 2024); MaRs Trigger LLC, Certificate of Formation (Texas Secretary of State, filed March 10, 2025); Mister Guns LLC, Certificate of Formation (Texas Secretary of State, filed June 20, 2011); Optics Planet, Inc., Business Entity Search (Illinois Secretary of State, Incorporation date October 12, 2000); PistolCap Limited Company, Certificate of Formation (Texas Secretary of State, filed October 21, 2020); ProSource Firearms LLC, Certificate of Formation (Texas Secretary of State, filed December 28, 2020); Superior Firearms of Texas LLC, Certificate of Formation (Texas Secretary of State, filed May 30, 2018); Z3 Productions LLC, Entity Summary Information (Oklahoma Secretary of State, Formation date January 9, 2025).

I understand from publicly available materials that Polymer Pew is solely owned by Van Tan Technologies LLC, which appears to have been organized in 2024. *See* "About Us," Polymer Pew, available at https://polymerpew.com/about-us/, accessed May 27, 2026; Van Tan Technologies LLC, Business Organizations Inquiry (Texas Secretary of State, Certificate of formation filed December 20, 2024).

33

~~FILED UNDER SEAL~~

of the defendant, the practical value of a damages award may be significantly less than its nominal amount. In such circumstances, monetary relief may be further diminished by the risk of nonpayment, rendering it an unreliable substitute for preventing ongoing competitive harm.

## VII.  Preliminary Context Regarding Materiality (Non-Quantified)

52.     I understand that Plaintiffs' business is highly concentrated in FRT® products and related components, and that substantially all of Rare Breed's revenue is derived from those products.[67] From an economic perspective, a firm whose revenues and competitive positioning are concentrated within a single product category is generally more vulnerable to competitive displacement within that category than a diversified firm capable of reallocating resources across broader product lines or business activities. Harm affecting a firm's core products may therefore have disproportionate effects on revenue generation, market position, customer relationships, and long-term competitive sustainability.[68]

53.     I further understand understand that the Accused Products compete directly with Plaintiffs' products within the same specialized market segment and are sold through overlapping channels to similar customer groups. In such markets, changes in customer adoption patterns, dealer behavior, and pricing expectations can influence future market outcomes over time, particularly where the market itself is relatively narrow and commercially developing. As discussed above, these effects may persist even if the underlying conduct is

---

[67] DeMonico Declaration, ¶ 24 ("All of Rare Breed's revenue comes from its FRT® products and related FRT® parts. Rare Breed does not sell any other firearms, firearm components, or accessories.").

[68] The relative costs and benefits of specialization and diversification is an active area of research and discussion in the areas of industrial organization and corporate finance. *See*, for example, Khanna, Naveen, and Sheri Tice, "The Bright Side of Internal Capital Markets," *Journal of Finance* 56, no. 4 (2001): 1489-1528; Sakhartov, Arkadiy, "Corporate Diversification and Risk: Portfolio Effects and Resource Redeployability," *Strategy Science* 7, no. 4 (2022): 317-329. *See* also Sidak, F. Gregory, "Irreparable Harm from Patent Infringement," *The Criterion Journal on Innovation* 2 (2017): 1-6, at 1 ("The Federal Circuit has found harm irreparable due to its immeasurability when patent infringement causes the patent holder to suffer price erosion or to lose market share, customers, goodwill, or brand value."), available at https://www.criterioninnovation.com/articles/sidak-irreparable-harm-from-patent-infringement.pdf, accessed May 20, 2026.

34

FILED UNDER SEAL

later curtailed because customer relationships, channel positioning, and purchasing expectations may not readily revert to their prior state.[69] [70]

54.    Prompt injunctive relief may prevent the accumulation of competitive effects that become increasingly difficult to reverse once market expectations, dealer relationships, and customer adoption patterns have shifted. In dynamic and developing markets, early competitive displacement may influence later purchasing behavior, inventory decisions, and product visibility within distribution channels. Economic research on path dependence and irreversible commitment recognizes that early market outcomes can shape subsequent competitive conditions over time, particularly where products compete within the same installed base and customer ecosystem.[71,72]

55.    These considerations further reinforce the limitations of retrospective monetary relief in this context. Even where certain observed economic effects may ultimately be estimated, monetary damages do not restore the time, market position, customer relationships, pricing environment, or competitive conditions that would have existed absent the alleged conduct.

---

[69] *See*, for example, Sidak, F. Gregory, "Irreparable Harm from Patent Infringement," *The Criterion Journal on Innovation* 2 (2017): 1-6, at 1 ("The Federal Circuit has found harm irreparable due to its immeasurability when patent infringement causes the patent holder to suffer price erosion or to lose market share, customers, goodwill, or brand value."), available at https://www.criterioninnovation.com/articles/sidak-irreparable-harm-from-patent-infringement.pdf, accessed May 20, 2026.

[70] *See* "Instilling Brand and Core Values into Your Pricing Strategy," FintastIQ, January 31, 2025 ("Pricing isn't just about numbers—it's a reflection of your brand's story and the values you stand for. Companies that align pricing with their identity create stronger customer loyalty and stand out in competitive markets."), available at https://www.fintastiq.com/blog/instilling-brand-and-core-values-into-your-pricing-strategynbsp, accessed May 20, 2026.

[71] *See*, for example, Shapiro, Carl, "Property Rules vs. Liability Rules for Patent Infringement," *University of California at Berkeley Working Paper* (2017): 1-35, at 26 ("The courts recognize that measuring the impact of ongoing infringement on the patent holder's profits can be very difficult in such cases. This is especially true in markets where competitive conditions are dynamic."), available at https://faculty.haas.berkeley.edu/shapiro/propvsliab.pdf, accessed May 20, 2026.

[72] On path dependence and irreversible commitment in competition, *see* Arthur, W. Brian, "Competing Technologies, Increasing Returns, and Lock-In by Historical Events," *Economic Journal* 99, no. 394 (1989): 116-131, at 116 ("Modern, complex technologies often display increasing returns to adoption in that the more they are adopted, the more experience is gained with them, and the more they are improved. When two or more increasing-return technologies 'compete' then, for a 'market' of potential adopters, insignificant events may by chance give one of them an initial advantage in adoptions. This technology may then improve more than the others, so it may appeal to a wider proportion of potential adopters. It may therefore become further adopted and further improved. Thus, a technology that by chance gains an early lead in adoption may eventually 'corner the market' of potential adopters, with the other technologies become locked out."), available at https://www.jstor.org/stable/2234208, accessed May 20, 2026.

FILED UNDER SEAL

Where competitive displacement affects a firm whose business is concentrated in the affected product category, the resulting effects may be particularly difficult to reverse through later compensation alone.[73]

## VIII. Conclusion

56. Based on my experience as an economist, my review of the materials provided and publicly available sources, and established economic principles, it is my opinion that the alleged conduct can cause immediate, ongoing, and compounding economic harm. The mechanisms described above, including substitution in durable goods markets, loss of lead time, distribution channel displacement, price erosion, entry dynamics, and expectation-driven demand effects, operate both independently and in combination to alter competitive conditions over time.

57. From an economic perspective, these effects are particularly significant in a narrow and specialized market, where purchasing decisions, pricing expectations, and channel relationships can adjust rapidly and become entrenched. Once customers, dealers, and intermediaries alter their behavior in response to competitive substitution or uncertainty, those changes influence subsequent market outcomes and may persist even if the underlying conduct is later curtailed. As a result, the relevant harm is not limited to a series of discrete transactions but includes changes in the structure and trajectory of the market.

58. Accordingly, even where certain components of economic harm can be estimated, monetary damages do not restore the market conditions that would have existed absent the alleged conduct. Where harm reflects cumulative, path-dependent changes in expectations, relationships, pricing dynamics, and competitive positioning, retrospective compensation may be inherently incomplete. These economic considerations are consistent with the conclusion that monetary relief alone may be insufficient to prevent or remedy the effects of the alleged conduct during the pendency of this case.

---

[73] See *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ("...the Patent Act...provides that courts 'may' grant injunctive relief 'on such terms as it may deem reasonable to prevent or restrain infringement…'."), available at https://supreme.justia.com/cases/federal/us/547/388/, accessed May 20, 2026.

36

I declare under penalty of perjury that the foregoing is true and correct. Executed this _28_ th day of May 2026.


**Richard J. Eichmann**

Secretariat Advisors, LLC
135 Main Street, Suite 1850
San Francisco, CA 94105

37

FILED UNDER SEAL

# Appendix 1

Richard Eichmann
May 28, 2026

FILED UNDER SEAL



**Richard J. Eichmann**, CVA, MAFF

Managing Director

135 Main Street, Ste. 1850
San Francisco, CA 94105

Mobile: +1 (510) 542-4935
email: reichmann@secretariat-intl.com

Richard Eichmann is a Managing Director specializing in economic damages, valuation, and econometric analysis in complex commercial litigation. His work spans intellectual property, trade secret misappropriation, securities, class action, and breach of contract matters. He is frequently retained to quantify lost profits, reasonable royalties, unjust enrichment, price premium, and diminution in enterprise value, and to evaluate issues of apportionment, incremental benefit, class-wide impact, and loss causation.

Mr. Eichmann's expertise includes valuation of intangible assets, financial modeling, advanced econometrics, statistical sampling, and survey design. He has substantial experience analyzing large and complex datasets and developing rigorous damages models grounded in economic theory and empirical evidence, including the evaluation of opposing regression analyses, conjoint surveys, market simulations, and valuation methodologies.

He has been designated as an expert in 83 matters and has provided deposition, arbitration, and trial testimony in federal and state courts, international tribunals, and arbitration forums. With more than 30 years of experience in economic consulting, including over 27 years devoted to litigation consulting and the valuation of intangible assets, he has worked across technology, telecommunications, automotive, financial services, energy, consumer products, and emerging technology sectors. Prior to joining Secretariat, he served as Chair of the Intellectual Property Practice and Head of the San Francisco office at a global economic consulting firm.

## EDUCATION

- M.A., Economics, University of Michigan, Ann Arbor, MI 1996
- B.A., Economics, University of Michigan, Ann Arbor, MI 1995
- B.A., Philosophy, University of Michigan, Ann Arbor, MI 1995

## CERTIFICATIONS

- Master Analyst in Financial Forensics (MAFF) - Commercial Damages, 2016
  National Association for Certified Valuators and Analysts (NACVA)
  Credential ID 703

- Certified Valuation Analyst (CVA), 2009
  National Association for Certified Valuators and Analysts (NACVA)
  Credential ID 991115

FILED UNDER SEAL

## ASSOCIATIONS

- National Association for Certified Valuators and Analysts (NACVA)

## PROFESSIONAL EXPERIENCE

- NERA Economic Consulting, Inc. (San Francisco, CA, Los Angeles, CA), Sep. 2014 – 2025
  Senior Managing Director, Chair of Intellectual Property Practice, SF Office Head

- FTI Consulting, Inc. (San Francisco, CA, Chicago, IL), Feb. 2004 – Sep. 2014
  Managing Director, Director, Manager

- Cornerstone Research (Washington, DC), Feb. 2001 – Feb. 2004
  Research Associate, Senior Analyst

- E&Y, LLC (Washington, DC), Feb. 2000 – Feb. 2001
  Senior Consultant

- KPMG, LLC (Washington, DC), Jul. 1998 – Feb. 2000
  Consultant

- J.D. Power & Associates (Detroit, MI), Jul. 1996 – Jul. 1998
  Analyst

- Northern Virginia Community College (Alexandria, VA), Sep. 1998 – May. 1999
  Adjunct Lecturer, Economics

- University of Michigan – Institute for Social Research (Ann Arbor, MI), Jul. 1993 – Jul. 1996
  Researcher

## HONORS / AWARDS

- 'Top 25 Patent Damages Experts," Issued by Certified Patent Valuation Analyst (CPVA) designation · September 2025

- "Top 50 Government Consultants," Issued by The Consulting Group · December 2021.

- "40 Under Forty Valuation Analysts," Issued by National Association of Certified Valuators and Analysts (NACVA) · June 2014.

---

**Richard J. Eichmann, CVA, MAFF**                                                                 Page 2

FILED UNDER SEAL

## REPRESENTATIVE EXPERIENCE

### Patent and Trademark Litigation

- Patent Infringement (Chemical Mechanical Planarization (CMP) Process Slurry Technology) – Calculated patent infringement damages in the form of lost profits and reasonable royalty in the *CMC* matter.

- Patent Infringement (Cryptographic Processing Relating to Routers and Modems) – Rebutted an opposing damages expert's opinion for client *Cisco* regarding a reasonable royalty analysis that examined issues relating to the incremental benefit relating to cryptographic parallel processors.

- Patent Infringement (Standard Essential Patents Relating to DSL Technology) – Rebutted an opposing damages expert's opinion for client *2Wire* regarding FRAND reasonable royalty analysis that examined a modified top-down analysis estimating the benefits attributable to DSL SEP patents.

- Patent Infringement (Unmanned Aerial Vehicles - Drones) – Rebutted an opposing damages expert's opinion for client *Autel* regarding a lost profits and reasonable royalty analysis that examined the alleged incremental profit attributable to the benefits of patented drone technology.

- Patent Infringement (Thermal Cooling Technology) – Rebutted an opposing damages expert's opinion for client *Civiq* regarding a lost profits and reasonable royalty analysis that examined the alleged infringement of thermal cooling technology.

- Patent Infringement (Smart Phone Protective Screen Covers) – Rebutted an opposing damages expert's opinion for client *Aevoe* regarding a reasonable royalty that examined the incremental profit attributable to the benefits of patented smart phone screen protective covers.

- Patent Infringement (Smart Phone Mobile Camera Features) – Rebutted an opposing damages expert's use of survey studies as an indication of value for client *Motorola Mobility* in a patent infringement suit concerning camera and Wi Fi features.  Provided testimony within a jury trial before Judge Orrick in San Francisco, California.

- Patent Infringement (Social Media) – Provided client *Facebook* with a declaration that utilized statistical analysis to examine the underlying assumptions within the model of an opposing expert in a patent infringement suit.

- Patent Infringement (Enterprise Mobility Management) – Provided client *MobileIron* with an assessment of damages incurred as a result of an alleged patent infringement pertaining to Personal Information Management security. Provided testimony within a jury trial before Judge Grewal in San Jose, California.

- Patent Infringement (Gaming) – Rebutted an opposing damages expert's calculation of reasonable royalty for client *SteelSeries* in a patent infringement suit concerning gaming mice technology.  Provided testimony within a jury trial before Judge Payne in Marshall, Texas.

- Patent Infringement (Farm Equipment) – Hired as an expert to provide statistical analysis of the clinical trials run by an agricultural expert to examine the efficiency and alleged improved benefits of a mechanized corn seed planter.

- Patent Infringement (Mobile App – Video Streaming) – Provided a declaration relating to the economics of damages in support of a motion for an injunctive relief relating to patents associated with mobile streaming technology for *Eko*.

- Trademark Infringement (Hardware Trade Associations) – Assisted with the determination of potential market confusion among consumers and attendees of a national hardware trade association conference.  Calculated the impact on profits for the conference, in terms of damages, given the impact.

FILED UNDER SEAL

- Trademark Infringement (Pharmaceuticals) – Rebutted an opposing expert's damages opinion relating to alleged economic damages sustained by alleged market confusion for client *Fera Pharmaceuticals*.
- Copyright Infringement (Software) – Calculated damages sustained by a software manufacturer, *Quest Software, Inc*.

## Trade Secret Misappropriation

- Misappropriation of Trade Secrets (Institutional Software Trading Technology) – Served as the testifying damages expert for *BTIG* in a matter involving alleged misuse of proprietary trading technology; conducted rolling-window market-model event studies and related econometric analyses to estimate firm-specific abnormal returns and quantify approximately $332–$343 million in alleged unjust enrichment.
- Misappropriation of Trade Secrets (SaaS Healthcare Software) – Calculated lost profits and diminution value incurred and experienced by Claimant as result of subcontractor's alleged misappropriation of trade secrets relating to the SaaS healthcare software applied at the state-level to enact the ACA.
- Misappropriation of Trade Secrets (Networking and Telecommunications Market Reports) – Determined direct and consequential damages incurred by *Dell'Oro Group* as result of a breach of fiduciary duty by a former employee alleged to misappropriated trade secrets relating to the generation of standardized market reports.
- Misappropriation of Trade Secrets (Lithium Solid State Batteries) – Valuing seven trade secrets relating to lithium solid state batteries that were alleged to have been misappropriated by former employees of *Quantumscape Corporation*.
- Misappropriation of Trade Secrets (Pharmaceutical Adjudication Services) – Led team in the rebuttal of alleged lost profit and unjust enrichment claims in defense of a leading pharmaceutical adjudication service provider accused of having illegally acquired trade secrets from a former business associate.
- Misappropriation of Trade Secrets (Gene Therapy) – Rebutted an opposing expert's assessment of damages incurred by a former laboratory employee who alleged that a major academic university misappropriated his intellectual capital in the acquisition of a patented gene therapy.
- Misappropriation of Trade Secrets (Value Added Retailer) – Led team in the calculation of compensatory damages and unjust enrichment claims in defense of a value-added retailer in the Florida market accused of having illegally acquired trade secrets from a competitor.
- Misappropriation of Trade Secrets (Trading Models) – Named expert in a case that involved rebutting alleged damages sustained by an investment management company. The head of the quant group left, along with the core of his group to form a competitor investment management company. The Plaintiff alleged that when he left he took with him a proprietary trading model. Damages centered on valuing the worth and subsequent alleged diminution in value of the alleged stolen trading model.

## Antitrust

- Antitrust (Standard Essential Patents) – Provided consulting assistance to a confidential client regarding possible exposure to allegations on anticompetitive behavior due to its alleged failure to license patents at a fair, reasonable, and non-discriminatory (FRAND) rate that were deemed standard essential patents (SEP).
- Antitrust (Real Estate Markets) – Managed the analyses generated to rebut two expert reports that sought to calculate damages in an alleged price-fixing case. Provided statistical support in

FILED UNDER SEAL

the case with regard to an examination of the validity of the plaintiff's expert's yardstick methodology.

- Antitrust (Construction Commodity) – Designed and managed statistical and econometric analyses to investigate the impact of alleged price-fixing among producers of a construction input commodity. Federal Sentencing Guideline dictated the estimation of affected commerce. A two-stage regression analysis that sought to isolate whether prices of alleged impacted months was utilized.  The methodology in the case was ultimately described in an article presented at the Western Economic Association International Annual Conference in Vancouver, B.C. on July 1, 2009

- Antitrust (Energy) – Reviewed plaintiff's pricing methodology and presented an alternative mitigated price methodology to the Federal Energy Regulatory Commission (FERC) that was ultimately accepted in the matter of the California energy dispute, concerning the defense of thermal generators against the charges of price fixing and collusion.

- Antitrust (Energy) - Conducted statistical analyses of trader behavior to determine the probability of systematic gaming behavior, in the matter of FERC allegations on natural gas traders, concerning the defense of energy futures trades against the charges of price manipulation.

- Antitrust (Energy) - Managed and led programming analyses of large disparate data sets for determining liability and timing issues, in the matter of an antitrust dispute concerning allegations of collusion in the electric markets.

- Predatory Pricing Behavior (Pharmaceuticals) – Designed and managed the execution of econometric and statistical analyses of HIV pharmaceutical drugs as they pertained to alleged predatory pricing behavior of a supplier.  Mr. Eichmann generated code to analyze various model specifications, correcting for first-series serial correlation that might indicate what exogenous variables influenced markets and how.

## Breach of Contract

- Breach of Contract (Semiconductors) – Quantified delay-driven lost profits and duplicative costs resulting from the alleged termination of a semiconductor fabrication agreement for *Pakal Technologies, Inc*.

- Breach of Contract (Broadband Telecommunications) – Estimated damages sustained by *Tribal Solutions* in a breach of fiduciary duty matter relating to the formation of a competitor entity by the defendants while still employed by the plaintiff.

- Breach of Contract (Non-Compete Provisions / Drayage Services) – Estimated the irreparable harm to *Roadrunner* in a breach of contract relating to non-compete provisions in a Stock Purchase Agreement.

- Breach of Contract (Winery) – Calculated damages sustained by *Close LaChance Wines* in a breach of contract allegation litigated before JAMs arbitration.

- Breach of Contract (Intellectual Property / Fraud) – Led team in the calculation of damages for a case where the plaintiff alleged that the defendant had failed to disclose a potential liability with regard to a possible infringement of intellectual property concerning soybean germ plasma prior to their merging of assets. The alleged liability materialized several years later and the plaintiff then sought indemnification under the benefit of the bargain method.

- Breach of Contract (Recreational Vehicles) – Rebutted the statistical validity of an opposing expert's inferences on the use of his survey design in a matter dealing with the impact of sales to a recreational manufacturer as a result of an alleged harm to their reputation due to an interior drywall component.  Within the same, case he wrote a separate report that rebutted the statistical validity of an economic expert's damage calculation that sought to calculate the impact on sales due to an alleged reputational loss.

FILED UNDER SEAL

- Breach of Contract (Furniture) – Calculated lost profit damages alleged in a breach of contract case for *DWS International, Inc.* that involved analyzing management forecasts to estimate the fair market value of a lost opportunity as it related to the patio furniture market. Testified at trial before a jury trial in the Southern District of Ohio.

- Breach of Contract (Breast Pumps) – Calculated lost profit damages alleged in a breach of contract case for *Whittlestone, Inc.* that analyzed margin risk to estimate the fair market value of a lost opportunity as it related to the electric breast pump market.

- Breach of Contract (Agricultural Commodities) – Analyzed the short-term fixed cost structure of a slaughter house operating in a perfectly competitive environment as part of a breach of contract dispute in the agricultural commodities market.

- Breach of Contract (Telecommunications) - Managed the analytical aspects of a complex damage calculation model and prepared and presented our findings to counsel in the matter of a breach of contract dispute between two U.S. telecommunications firms.

- Breach of Contract (Auto Parts) – Calculated lost profits as a result of a breach of contract regarding easement rights and advertisement obstruction.

- Breach of Contract (Hair Coloring Products) – Calculated lost profits for client, *BehindtheChair.com* in an alleged breach of contract regarding profit distributions from a hair-coloring product business.

## Valuation Consulting and Litigation

- Settlement Valuation (Luxury Vehicle Class Action) – Conducted a valuation of a proposed settlement between the parties in the *Bullard et al. v. Jaguar Land Rover Automotive* class action matter.

- Breach of Fiduciary Duty (Visual AI Algorithm Software for Advanced Camera Systems – Smartphones, Tablets, Smart Televisions, Cars, and Robots) – Conducted a valuation utilizing the income and market approaches in a dispute between minority shareholders in a buyout under false pretenses in the *ArcSoft* dispute.

- Employee Stock Option Valuation (Retail Clothing) – Performed two business valuations for *Robert Talbott, Inc.* to estimate both the exercise current share price of a non-controlling, non-marketable privately-held high-end cloth manufacturer used to estimate the value of an alleged employee stock option held by a former CEO in dispute.

- Business Valuation (e-Commerce Start-Up) – Utilized ARIMA time series techniques to forecast subscription revenues of a charitable social network site, for which he calculated the fair market value of the minority interest.  The income approach relied heavily on the use of historical subscription data that allowed for a range of values within a statistically confident interval.

- Business Valuation (Telecommunications) - Conducted a business valuation of an alleged lost international telecommunications opportunity that took into consideration varying capital structures within financial projections that served to rebut a plaintiff's valuation model.

- Business Valuation (Financial Services) – Assisted with the critique of a business valuation involving a minority interest of an investment management firm arising out of an employment dispute.

## Commercial Class Action Litigation

- Class Action (Copyright/DMCA) – Evaluated and developed class-wide damages methodologies in *Cook v. Meta Platforms*, a putative class of artists and small business owners alleging that Meta knowingly facilitated copyright infringement and counterfeit ad scams through its advertising platform, in violation of the Copyright Act, DMCA, and unfair competition laws.

FILED UNDER SEAL
2091

- Class Action (Pediatric Sleep Aids) – Rebutted the proposed conjoint survey and supply side analyses of Plaintiffs in *Zarbee's*, a class of individuals alleging that they received excessive amounts of melatonin in a sleep aid product.

- Class Action (Eyeglasses) – Calculated damages sustained by a class of individuals whose eyeglasses had been sold to them with an alleged false claim of increased precision by *LensCrafters* AccuFit measurements.  Utilized a conjoint analysis producing a Willingness to Pay result from a mixed logit model to run a market simulation to arrive at the premium consumers paid as a result of not knowing about the misrepresentation.

- Class Action (Automotive) – Served as damages expert in a multi-state consumer class action involving alleged design defects in GM's 8-speed Hydra-Matic transmissions (MY15–MY19).  Calculated classwide economic damages under alternative benefit-of-the-bargain frameworks, including cost-of-repair and price premium methodologies. Developed retail-channel vehicle population estimates, analyzed GM sales and warranty data, and evaluated aggregate damages under varying take-rate and appeal assumptions.

- Class Action (Automotive) Served as damages expert in a four-state consumer class action involving MY19–MY22 GM trucks equipped with 8L45 and 8L90 transmissions. Utilized a conjoint-based mixed logit demand model integrated into a full market-equilibrium simulation to estimate point-of-sale overcharges. Conducted independent hedonic regression analysis of secondary-market transaction data to measure diminution in value and reconcile lifecycle pricing effects.

- Class Action (Diesel Engines) – Calculated damages sustained by a class of individuals whose Class 8 trucks had been sold to them with a manufacturer defect relating to *Paccar* MX-13 diesel engines.  Utilized a hedonic regression to isolate the effect of the defect on the resale value of the vehicles.

- Class Action (All-Terrain Vehicles) – Calculated damages sustained by a class of individuals whose ATV vehicles had been sold to them with a manufacturer defect.  Utilized a conjoint analysis producing a Willingness to Pay result from a mixed logit model to run a market simulation to arrive at the premium consumers paid as a result of not knowing about the defect.

- Class Action (Automotive) – Calculated damages sustained by a certified class of individuals whose vehicles had been inappropriately seized by a municipality.  The task involved analyzing auction and automotive valuation data to determine both the delta and the float.

- Class Action (Automotive) – Designed and managed the execution of econometric and statistical analyses of secondary market pricing in a particular vehicle segment in defense of price impact allegations due to alleged non-disclosures by *Ford Motor Company*.  We utilized econometrics to demonstrate that a recall did not, as the plaintiffs alleged, negatively impact depreciation rates of vehicles, but rather other market forces explain the sudden drop, such as rising lease terminations, market segment saturation.

- Class Action (Software Auctions) – Addressed class certification issues as they arose in matter dealing with the alleged breach of contract in the use of auctions.  The matter involved analyzing the expected value of an auction.

- Class Action (Gaming) – Hired by the Indiana state lottery commission to provide consulting services in relation to a class action litigation matter, where he designed and managed the execution of an econometric model that generated expected consumer pricing behavior of a scratch-off game.  The model determined the 95 percent confidence interval of sales the lottery commission could have expected to receive but for an alleged misstatement of probabilities on their website.

- Class Action (Breach of Contract / Fraud) – Led team in the calculation of damages for a case where the plaintiff alleged that the defendant willingly failed to pay royalties. The case involved a

FILED UNDER SEAL

stratified statistical sampling so as to investigate the liability claims of intent as well as damage implications, if any.

## False Advertising

- False Advertising (Refresh Rates in Televisions) – Rebutted class action damages for *Vizio* in a matter involving alleged misrepresentation of refresh rates in television monitors.

- False Advertising (Enterprise Resource Planning Software Implementation) – Rebutted alleged economic damages against *Oracle* sustained by the failed Cover Oregon project due to an alleged failed ERP implementation system. (http://www.oregonlive.com/politics/index.ssf/2016/09/post_183.html)

- False Advertising (Enterprise Resource Planning Software Implementation) – Rebutted alleged economic damages sustained by a global online vehicle auction business due to an alleged failed ERP implementation system for *Sparta Consulting, Inc.*

- False Advertising (Credit Cards) – Calculated economic damages sustained by a credit card processing company, *Heartland Payment Systems, Inc.*, due to the alleged false advertising of its competitor regarding pass-through costs to merchants.

- False Advertising (Consumer Products) – Rebutted economic damages for *Philips Oral Healthcare, Inc.,* alleged to have been sustained by the class as a result of an alleged false claim regarding product quality.

- False Advertising (Trade Association) – Calculated economic damages sustained by a promoter of a trade association trade show that alleged that a competitor trade show was creating consumer confusion due to the use of their trademark infringement and false advertisement.

- False Advertising (Hand Tools) – Calculated economic damages alleged by a class as a result of false advertising, which promoted hand tools sold in the United States as "American made."

- False Advertising ('Sippy' Cups) – Calculated economic damages alleged by a competitor as a result of false advertising, which stated that certain children's 'sippy' cups held certain patents, which they did not.

- False Advertising (Beverages) – Calculated economic damages alleged by a competitor as a result of consumer confusion brought on due to false advertising, which stated that certain beverages held certain ingredients, which they did not

## Labor and Employment Litigation

- Class Action (Discrimination) – Analyzed the economics relating to the closing of certain call-centers for an airline company alleged of engaging in age discrimination.  While initial analyses provided prima facie evidence of possible age discrimination when identifying the statistical differences among call-centers, further analysis indicated that regional influences were in fact greater and more prominent in influencing the company's actions.

- Class Action (Discrimination) – Generated a probit econometric model of the firm's data to model the effects of race, gender, and other attributes and their alleged effect on the probability of an employee being fired as part of an alleged employment discrimination case.

- Class Action (Discrimination) – Analyzed class certification issues as they related to an allegation that defendant chose to close an airline call-center due to the gender and age of its employees. The analysis included both an inquiry of descriptive and inferential statistics as well as cost accounting considerations

- Class Action (Discrimination) – Designed and managed statistical and econometric analyses to investigate the allegation of discriminatory behavior within a major bottling distributor.

FILED UNDER SEAL

- Class Action (Wage/Hour Dispute) – Analyzed class certification issues as they related to a wage-hour dispute of a perfume manufacturer.  Conducted a stratified sampling exercise of hand-written invoices of proposed class members and examined the variability, if any, of their work experiences that would influence whether or not they were improperly classified as independent contractors.

- Class Action (Wage/Hour Dispute) – Analyzed class certification issues as they related to a wage-hour dispute of the *Skywest* airline company.  Examined various influencing factors that played a role in determining the probability of an alleged class member missing his/her lunch break and how the variance revealed from the data among the influencing factors affects commonality among the alleged class members.

## Securities

- Securities Litigation (IPO) - Adapted 10b-5 securities litigation model to estimate alleged damages of IPO allocations and valuations, in the matter of a class action lawsuit against a consortium of major Wall Street underwriters.

- Breach of Contract (Hedge Funds) – Calculated damages for a case that dealt with breach of an investment contract between a seed financier and a hedge fund for *SGAM Newedge Management, Inc.*  The case involved valuing a hedge fund as a proxy for alleged lost profits. Testified at a JAMS arbitration.

- Securities Fraud (Stock-Option Back Dating) – Derived statistical models to examine the frequency of stock-option back dating instances and their effect on reported earnings.

- Securities Fraud (Earnings-Smoothing) – Led a team of financial economists to investigate and isolate the prevalence and method in which earnings smoothing impacted share value.

- Mortgage-Backed Securities (Statistical Analysis) – Managed and designed econometric models tasked with analyzing loss causation as it relates to losses across tranches within securitizations.

- Mortgage-Backed Securities (Statistical Analysis) – Named sampling expert in the *Galena Street Fund v. Wells Fargo Bank, N.A.* matter.

- Mortgage-Backed Securities (Statistical Analysis) – Named sampling expert in the *Federal Housing Finance Agency v. J.P. Morgan Securities LLC et al* matter.

- Mortgage-Backed Securities (Statistical Analysis) – Named sampling expert in the *Federal Home Loan Bank of Pittsburgh v. J.P. Morgan Securities LLC et al* matter.

- Mortgage-Backed Securities (Statistical Analysis) – Provided statistical support of a motion to deny class certification of a proposed class of investors that sought restitution from an underwriter for allegedly not having properly accounted for the risk of the underlying collateral of several securitizations.

- Mortgage-Backed Securities (Statistical Analysis) – Provided statistical and econometric support examining the factors that influence the likelihood of loan default as it pertained to a class action that sought restitution of the alleged wrongdoings of a municipal bond insurance agency.

- Mortgage-Backed Securities (Statistical Analysis) – Provided statistical support in examining the difference of bid and close data provided a municipal bond insurance agency.

- Securities Litigation (10b(5)) – Conducted event studies and loss causation models on a variety of 10b(5) class action case matters.

- Insider Trading – Created an econometric model to analyze the impact and materiality of alleged insider tip investigated by the SEC.

FILED UNDER SEAL

**Economic and Statistical Consulting**

- Statistical (Gemology) – Designed statistical tests to examine the likelihood of collusion within international grading facilities of various gems, including diamonds.

- Economic (Automotive Markets) – Co-authored the U.S. automotive industry newsletter for J.D. Power and Associates, working directly under the senior economist in executing and managing their syndicated market forecasts and reviews.

- Econometrics (Forecasting) - Created and maintained ARIMA production and sales forecast models for the U.S. and developing markets, including Asia and Latin America.

- Forensic Investigations – Led a FCPA investigation for a U.S. petroleum company with subsidiaries in the Latin America.  The case dealt with utilizing statistical techniques on a large set of general ledger transactions and a series of financial statement analyses that ultimately revealed a complex fraud where funds were being laundered via service contracts to funnel bribes.

## PUBLICATIONS

- "Making Patent Citations Count: Statistical Tools for Valuing Innovation in Litigation and Licensing," co-authored with Adam Rhoten, *Loyola Law Review*, Vol. 72, forthcoming 2026.

- "Embracing AI in Economic Testimony: Integrating Tools with Caution and Validation." *The Value Examiner*, September/October 2025, 4–12.

- "Why Funder Forecasts Don't Belong in Royalty Analyses," published by *Law360* on June 24, 2025.

- "The Role of Economics on the Road to Autonomous Vehicles and Digital Mobility," co-authored with D. Hanson, Richard Marsden, George Anstey, Grant Saggers, Garrett Glasgow, C. Phillipp Heller, Hector Lopez, Bruno Soria, and Will Taylor, published by NERA Economic Consulting, Inc., Insight in Economics™, August 17, 2021.

- "Forward Citation Analysis as a Means to Apportion Relative Value in Patent Infringement Cases," published by the National Association for Certified Valuators and Analysts (NACVA), QuickRead on February 18, 2016.

- "An Overview of Methods for Estimating Lost Revenues in Economic Damages," published by the National Association for Certified Valuators and Analysts (NACVA), QuickRead on June 18, 2015.

- "Use of Two-Stage Linear Regression Models in Identifying the Existence and Extent of Affected Commerce in Price-Fixing Cases," co-author with M. Mercurio, working paper.

- "Continuing Patent Applications and Performance of the U.S. Patent and Trademark Office – Extended," co-authors C. Quillen and O. Webster, *The Federal Circuit Bar Journal*, August 2002.

- "Southeast Asian Crisis: Implications in the Asian Automotive Industry," co-author R. Schnorbus, J.D. Power and Associates Syndicated Report, December 1997.

FILED UNDER SEAL

## PRESENTATIONS

- "Trade Secret Damages," presented on October 21, 2024, as a guest lecturer for the UC-Berkeley Law School for a Law course titled "Law 277.1 sec.1 - Trade Secret Law."

- "IP & Antitrust: Considerations for the High-Tech Sector," panelist, hosted by Antitrust West Coast Conference, held on November 17, 2020.

- "Lost Profits: Principles, Methods and Strategies to Prove and Defend Damages LIVE Webcast," presenter, hosted by The Knowledge Group, held on October 7, 2019.

- "Smallest Saleable Patent-Practicing Unit when Deriving FRAND in Light of Recent Federal Rulings," presenter, hosted by the Damages and Injunction Committee of the IPO, held on June 13, 2019 via a Committee hosted webinar.

- "The Concept of Apportionment in Patent Infringement Matters: Methods Considered," presented at the NACVA and CTI's 2019 Annual Consultants' Conference in Salt Lake City, UT on June 6, 2019.

- "Overview of Damages in IP Litigation Involving Standard Essential Patents (SEPs)," presented as part of the "Issues in Litigation" section of the Western Economic Association International (WEAI) Conference in Tokyo, Japan on March 22, 2019.

- "Calculating Intellectual Property Damages – How to Prepare for the 2019 Landscape," co-presenter, hosted by The Knowledge Group, held on February 13, 2019 via webinar.

- "IP and Antitrust Developments for the High Tech Sector," panelist, Antitrust West Coast 2019, held on February 12, 2019 in San Francisco, CA.

- "An Overview of Damages and the Role of the Damages Expert in Intellectual Property," instructor, Financial Valuation Seminar, hosted by the National Association of Certified Valuators and Analysts (NACVA), held on December 14, 2018 in Ft. Lauderdale, Florida, http://www.nacvanation.com/ftlauderdale/.

- "Transnational IP Litigation: Opportunities and Challenges – Focus on US IP Litigation," panelist, Berkeley-Tsinghua Annual Forum of 2018, jointly hosted by the Berkeley and Tsinghua Schools of Law, held on December 4, 2018 in Beijing, China.

- "Trade Secret Damages: Remedies for Victims of Trade Secret Violations," panelist, hosted by the Daily Journal Professional Education, held on October 30, 2018 in Palo Alto, California.

- "Factors to Consider for Injunctive Relief from an Economic Perspective: Irreparable Harm," presenter, hosted by the Damages and Injunction Committee of the IPO, held on October 11, 2018 via a Committee hosted webinar.

- "Mock International Arbitration: Toward Early Dispute Resolution of Standard Essential Patents (SEPs) in the 5G Era," presenter, hosted by the Japan Patent Office, the University of Tokyo, and the Rader Foundation, held on June 29, 2018 at the University of Tokyo, Japan.

- "Patent Infringement Damages," presented on February 1, 2018, presenter, hosted by The Knowledge Group via a webinar.

- "Trade Secret Damages from the Perspective of a Damages Expert," presented on October 18, 2017, as a guest lecturer for the UC-Davis School of Law course titled "Trade Secrets and Restrictive Covenants, Employee Mobility, Raids, and Corporate Espionage."

- "Trade Secret Damages and Remedies," co-presenter, hosted on May 19, 2017 by Bridgeport Continuing Education in San Francisco, California.

- "A Penny or a Pound: Apportioning Damages in Patent Cases," panel member hosted on May 17, 2017, by the Licensing Executive Society (LES), Silicon Valley Chapter in Palo Alto, California.

- "Raising Start-Up Capital," panel member of a webinar, hosted by Expert Webcast on January 7, 2016.

---

FILED UNDER SEAL

- "Patent Infringement Reasonable Royalty Damages: Apportion the Increment?," panel member hosted by the Asian Pacific American Bar Association (APABA) in Palo Alto, CA on November 23, 2015.

- "Calculation of Economic Damages in Patent Litigation Matters," at the Financial Forensics and Expert Witness Conference, hosted by the National Association for Certified Valuators and Analysts (NACVA) in Houston, TX on October 19, 2015.

- "Ease of Enforcement and Magnitude of Damages Awards as Determinative Factors in Establishing the Market Value of a Patent: Trends in IP Damages Awards," at the Tenth Annual Conference on Best Practices in Patent Monetization, hosted by Law Seminars International in San Francisco, CA on March 26, 2015.

- "Supreme Court Takes a Middle Path in Reaffirming Fraud on the Market Theory," presented via Thomson Reuters as a national webinar on September 3, 2014 and currently available online via West LegalEdCenter.

- "Statistical and Technological-Based Fact-Gathering in Wage-and-Hour Cases," at the Annual Wage & Hour Conference presented via Bridgeport Continuing Education in San Francisco, CA on October 10, 2013.

- "Business Damages Analysis & Modeling: Litigating and Proving Damages," presented via Bridgeport Continuing Education in San Francisco, CA on May 10, 2013.

- "New Disclosure Rules and What They Mean For ERISA Class Certification," panel speaker for FTI Consulting ERISA Fiduciary Litigation and Compliance Breakfast Series 2012 in Chicago, IL on April 24, 2012.

- "Understanding and Proving Damages: Business Damages Analysis and Modeling," presented via Bridgeport Continuing Education in San Francisco, CA on April 12, 2012.

- "Litigating a Trade Secret Case: Economic Damage Considerations," presented via Bridgeport Continuing Education in San Francisco, CA on December 9, 2010.

- "Financial Forecasting," presented within the Mergers and Acquisitions section of the American Institute of Certified Public Accountants (AICPA) meeting held in San Francisco, CA on August 4, 2010.

- "Application of Multivariate Regression Analysis in Identifying Economic Damages," white paper presented under the "Law and Crime" section of the Western Economic Association International Annual Conference in Portland, Oregon on July 1, 2010.

- "The Use of Regression Analysis as a Means to Better Forecast Sales When Using the DCF Method," presented within the Business Valuation section of the National Association of Certified Valuators and Analysts (NACVA) and Institute of Business Appraisers (IBA), 2010 Annual Consultants' Conference, held in Miami, Florida, on June 4, 2010, now available online as a webinar (https://www.nacva.com/store_product.asp?prodid=120).

- "Hand Rule as a Basis for Calculating Punitive Damages" paper originally presented at the Southern Economic Association Conference in Washington, DC on November 19, 2005 and again at the Annual Meeting of the World Institute for Research and Publication (WIRP) – Law on May 16, 2010.

- "Use of Two-Stage Linear Regression Models in Identifying the Existence and Extent of Affected Commerce in Price-Fixing Cases," paper co-presented with M. Mercurio under the "Commercial Damages and Antitrust Litigation" section of the Western Economic Association International Annual Conference in Vancouver, B.C. on July 1, 2009.

- "An Economic Analysis of Punitive Damages" co-presented with Andrew Frey of Mayer, Brown, Rowe & Maw LLP and Office of General Counsel of Ford Motor Company at a conference titled "Managing Risks in High Stakes Litigation" in Chicago, IL on December 2, 2004

**FILED UNDER SEAL**
2005

## EXPERT DESIGNATIONS, REPORTS, AND TESTIMONY

85 TOTAL: 45 PLAINTIFFS (53%) & 40 DEFENDANTS (47%)
118 REPORTS FILED | 57 DEPOSITIONS | 5 ARBITRATION TESTIMONIES | 7 TRIAL TESTIMONIES

1. *ABC IP, LLC AND RARE BREED TRIGGERS, INC. V. AS DESIGNS, LLC, ET AL.,* UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF NORTH CAROLINA, CASE NO. 1:25-CV-1192, EXPERT REPORT FILED APRIL 24, 2026. (HON. WILLIAM LINDSAY OSTEEN, JR.).

2. *ERIC OLSON ET AL. V. WORLD FINANCIAL GROUP AGENCY, LLC ET AL.,* JUDICIAL ARBITRATION AND MEDIATION SERVICES, JAMS REF. NO. 5110000677, EXPERT REPORT FILED APRIL 17, 2026, REBUTTAL REPORT FILED MAY 8, 2026.

3. *HELMS ET AL. V. GENERAL MOTORS LLC,* UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF MICHIGAN, CASE NO. 2:22-CV-10783-MAG-KGA, EXPERT REPORT FILED FEBRUARY 20, 2026, DEPOSITION TESTIMONY GIVEN APRIL 27, 2026. (HON. MARK A. GOLDSMITH).

4. *LARGAN PRECISION CO., LTD. V. MOTOROLA MOBILITY LLC*, IN THE HIGH COURT OF DELHI AT NEW DELHI, (ORDINARY ORIGINAL COMMERCIAL JURISDICTION), CS (COMM) NO. 795 OF 2022 AND CS (COMM) NO. 3 OF 2024, EVIDENCE BY WAY OF AFFIDAVIT (EWA) FILED ON JANUARY 31, 2026, DEPOSITION TESTIMONY GIVEN APRIL 13, 2026, APRIL 15, 2026, APRIL 17, 2026, APRIL 20, 2026, AND APRIL 22, 2026.

5. *PAKAL TECHNOLOGIES, INC. V. ROBERT BOSCH SEMICONDUCTORS, LLC ET AL.*, SUPERIOR COURT FOR THE STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO, CASE NO. CGC-23-61129, EXPERT REPORT FILED ON JANUARY 23, 2026, DEPOSITION TESTIMONY GIVEN JANUARY 26, 2026.

6. *NUTANIX, INC. V. BALA KUCHIBHOTLA, KAMALDEEP KHANUJA, BAKUL BANTHIA, AND TESSELL, INC.*, JUDICIAL ARBITRATION AND MEDIATION SERVICES, JAMS REF. NO. 5110000487, EXPERT REPORT FILED ON OCTOBER 24, 2025, REPLY TO REBUTTAL REPORT FILED JANUARY 16, 2026, DEPOSITION TESTIMONY GIVEN FEBRUARY 17, 2026.

7. *JENNIFER L. COOK D/B/A JK COOK, JL COOK SCULPTOR AND SNAKEARTS.COM ET AL. V. META PLATFORMS, INC. F/K/A FACEBOOK, INC.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 3:22-CV-02485-JCS, DECLARATION FILED ON SEPTEMBER 17, 2025, DEPOSITION TESTIMONY GIVEN OCTOBER 30, 2025, REPLY DECLARATION FILED ON JANUARY 27, 2026. (HON. JOSEPH C. SPERO AND HON. YVONNE GONZALEZ ROGERS)

8. *BTIG, LLC V. STONEX FINANCIAL, INC. AND STONEX GROUP, INC.*, FINRA ARBITRATION, REF. NO. 1210040786, REPORT FILED ON AUGUST 18, 2025, DECLARATION FILED ON SEPTEMBER

---

**Richard J. Eichmann, CVA, MAFF**

FILED UNDER SEAL

2, 2025, ARBITRATION TESTIMONY GIVEN ON DECEMBER 9, 2025, REBUTTAL ARBITRATION TESTIMONY GIVEN ON JANUARY 14, 2026.

9.   *J. BULLARD ET AL.* V. *JAGUAR LAND ROVER AUTOMOTIVE, ET AL.*, U.S. DISTRICT COURT, DISTRICT OF NEW JERSEY, CASE NO. 2:20-CV-14464-JMV-JBC, REPORT FILED ON MAY 28, 2025 (HON. JOHN MICHAEL VAZQUEZ)

10.  *LARGAN PRECISION CO., LTD. V. MOTOROLA MOBILITY LLC*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 4:21-CV-09138-JSW, REPORT FILED ON MAY 16, 2025, SUPPLEMENTAL REPORT FILED ON JUNE 13, 2025, REBUTTAL REPORT FILED JUNE 13, 2025, DEPOSITION TESTIMONY GIVEN JULY 9, 2025, DEPOSITION TESTIMONY GIVEN OCTOBER 8, 2025. (HON. JEFFREY S. WHITE)

11.  *(CONFIDENTIAL) V. (CONFIDENTIAL)* – RELATING TO SAAS HEALTHCARE EXCHANGES, CPR INSTITUTE FOR DISPUTE RESOLUTION, CASE NO. G-24-7-NA, DECLARATION FILED ON JANUARY 17, 2025.

12.  *LOPEZ ET AL. V. ZARBEE'S, INC.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 3:22-CV-04465-CRB, DECLARATION FILED ON SEPTEMBER 27, 2024. (HON. CHARLES R. BREYER)

13.  *STARR ET AL. V. VSL PHARMACEUTICALS, INC. ET AL.*, U.S. DISTRICT COURT, DISTRICT OF MARYLAND, CASE NO. 8:19-CV-02173-TDC, EXPERT REPORT FILED ON JUNE 3, 2024, DEPOSITION TESTIMONY GIVEN JULY 15, 2024, REPLY REPORT FILED ON NOVEMBER 20,2024. (HON. LYDIA K. GRIGGSBY) ([VSL PROBIOTIC BUYERS WIN CLASS CERT. IN RICO CASE - LAW360](#))

14.  *TRIBAL SOLUTIONS GROUP, LLC ET AL. V. VALANDRA ET AL.*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF MISSISSIPPI, NORTHERN DIVISION, CASE NO. 3:23-CV-00010-CWR-LGI, EXPERT REPORT FILED ON APRIL 5, 2024, SUPPLEMENTAL REBUTTAL REPORT FILED ON JULY 18, 2024, AND ON AUGUST 30, 2024, DEPOSITION TESTIMONY GIVEN AUGUST 28, 2024. (HON. CARLTON W. REEVES)

15.  *ABERIN ET AL. V. AMERICAN HONDA MOTOR CO., INC.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 4:16-CV-04384-JST, EXPERT REPORT FILED ON APRIL 1, 2024. (HON. JON S. TIGAR)

16.  *CMC MATERIALS, INC. V. DUPONT DE NEMOURS, INC. ET AL.*, U.S. DISTRICT COURT, DISTRICT OF DELAWARE, CASE NO. 1:20-CV-00738-MN, EXPERT REPORT FILED ON MARCH 27, 2024,

FILED UNDER SEAL

REBUTTAL REPORT FILED ON MAY 10, 2024, DEPOSITION TESTIMONY GIVEN MAY 30, 2024. (HON. JENNIFER L. HALL)

17. *MARC CHAN ET AL.* V. *ARCSOFT INC. ET AL.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION, CASE NO. 4:19-CV-05836 JSW, EXPERT REPORT FILED APRIL 27, 2023, DEPOSITION TESTIMONY GIVEN JULY 21, 2023, TRIAL TESTIMONY GIVEN JANUARY 31, 2024. (HON. LAUREL BEELER)

18. *EDIBLE IP, LLC ET AL.* V. *1-800-FLOWERS.COM, INC. ET AL.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION, CASE NO. 20-CV-02405-VMC, EXPERT REPORT FILED ON FEBRUARY 17, 2023, DEPOSITION GIVEN MAY 11, 2023. (HON. OMAR A. WILLIAMS)

19. *TECSEC, INCORPORATED V. INTERNATIONAL BUSINESS MACHINES CORPORATION, SAS INSTITUTE, INC., SAP AMERICA, INC., SAP AG, CISCO SYSTEMS, INC., ORACLE AMERICA, INC. (F/K/A SUN MICROSYSTEMS, INC.), SYBASE, INC., SOFTWARE AG, ADOBE SYSTEMS, INC., EBAY, INC., PAYPAL, INC. AND ORACLE CORPORATION*, U.S. DISTRICT COURT, EASTERN DISTRICT OF VIRGINIA, CASE NO. 1:10-CV-00115 LMB-TCB, EXPERT REPORT FILED AUGUST 17, 2020, DEPOSITION TESTIMONY GIVEN ON SEPTEMBER 15, 2020 (HON. LIAM O'GRADY), AMENDED EXPERT REPORT FILED MARCH 31, 2023, (HON. PATRICIA TOLLIVER GILES)

20. *LUMASENSE TECHNOLOGIES, INC.* V. *ADVANCED ENGINEERING SERVICES*, LLC, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 5:20-CV-07905, EXPERT REPORT FILED ON SEPTEMBER 14, 2022. (HON. WILLIAM H. ORRICK)

21. *NETGEAR, INC. V. ASUSTEK COMPUTER, INC. AND ASUS COMPUTER INTERNATIONAL, INC.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 5:21-CV-08993, EXPERT REPORT FILED ON AUGUST 12, 2022. (HON. CHARLES R. BREYER)

22. *TARGA MANAGEMENT HOLDINGS, LLC, TARGA PARENT HOLDINGS, LLC, TARGA BUYER, LLC, THE CHUDY GROUP, LLC (D/B/A/ TCGRX) AND PARATA SYSTEMS, LLC V. DUANE S. CHUDY, DEAN A. CHUDY, JONATHAN F. CHUDY, GOLF GIFTS & GALLERY, INC., JAMES T. SPERNOW, MATTHEW E. NOFFSINGER, AND THE JFC GROUP (D/B/A TRUPAKRX)*, STATE OF WISCONSIN CIRCUIT COURT, MILWAUKEE COUNTY, CASE NO. 2021CV000938, EXPERT REPORT FILED ON JUNE 14, 2022, DEPOSITION TESTIMONY GIVEN SEPTEMBER 14, 2022. (HON. LAURA GRAMLING PEREZ)

23. *SPEERLY ET AL., V. GENERAL MOTORS, LLC*, U.S. DISTRICT COURT, EASTERN DISTRICT OF MICHIGAN, CASE NO. 2:19-CV-11044-DML-DRG, EXPERT REPORT FILED ON OCTOBER 9, 2021, DEPOSITION TESTIMONY GIVEN DECEMBER 3, 2021, EXPERT REPORT FILED ON FEBRUARY 20, 2026. (HON. DAVID M. LAWSON)

24. *ROBERT PONZIO ET AL.* V. *MERCEDES-BENZ USA, LLC AND DAIMLER AG*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION, CASE NO. 1:18-CV-03984-

FILED UNDER SEAL

MHC, DECLARATION FILED ON JANUARY 27, 2021 AND ON JULY 21, 2021. (HON. JOSEPH H. RODRIGUEZ)

25. *EXPRESS LIEN, INC.* V. *HANDLE, INC. ET AL.*, U.S. DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA, CASE NO. 2:19-CV-10156-SSV-MBN, EXPERT REPORT FILED ON MARCH 10, 2021, DEPOSITION TESTIMONY GIVEN APRIL 30, 2021. (HON. JANE T. MILAZZO).

26. *RINGCENTRAL, INC.* V. *NEXTIVA, INC. ET AL.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 5:19-CV-02626-NMC, EXPERT REPORT FILED ON JANUARY 19, 2021, REBUTTAL REPORT FILED ON FEBRUARY 24, 2021, DEPOSITION TESTIMONY GIVEN ON MARCH 12, 2021. (HON. NATHANAEL M. COUSINS)

27. *JBF INTERLUDE 2009 LTD – ISRAEL (COLLECTIVELY, "EKO")* V. *QUIBI HOLDINGS, INC.*, U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION, CIVIL ACTION NO. 2:20-CV-2299, DECLARATION FILED ON APRIL 1, 2020, REPLY DECLARATION FILED ON APRIL 21, 2020, DECLARATION FILED ON OCTOBER 27, 2020, DEPOSITION TESTIMONY GIVEN ON DECEMBER 8, 2020. (HON. JOHN A. KRONSTADT)

28. *APARTMENT OWNERS ASSOCIATION OF CALIFORNIA, INC. ET AL. V. CITY OF LOS ANGELES ET AL.*, SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES, CONSOLIDATED CASE NO. BC709658, EXPERT REPORT FILED OCTOBER 21, 2020, DEPOSITION TESTIMONY GIVEN ON NOVEMBER 23, 2020 (HON. MAREN E. NELSON)

29. *SZ DJI TECHNOLOGY CO., LTD. AND DJI EUROPE B.V. V. AUTEL ROBOTICS USA, LLC AND AUTEL AERIAL TECHNOLOGY CO. LTD.*, U.S. DISTRICT COURT, DISTRICT OF DELAWARE, CIVIL ACTION NO. 1:16-CV-00706-LPS-CJB, EXPERT REPORT FILED ON JANUARY 19, 2018, SUPPLEMENTAL REPORT FILED ON MARCH 7, 2018, REBUTTAL REPORT FILED ON JANUARY 23, 2020, DEPOSITION TESTIMONY GIVEN ON FEBRUARY 11, 2020, SUPPLEMENTAL REBUTTAL REPORT FILED ON JUNE 22, 2020, DEPOSITION TESTIMONY GIVEN ON JULY 6, 2020. (HON. LEONARD P. STARK)

30. *ARIZA ET AL.* V. *LUXOTTICA RETAIL NORTH AMERICA, D/B/A, LENSCRAFTERS*, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF NEW YORK, BROOKLYN DIVISION, CASE NO. 1:17-CV-05216-PKC-RLM, EXPERT REPORT FILED ON SEPTEMBER 10, 2019, REBUTTAL REPORT FILED ON NOVEMBER 13, 2019, DEPOSITION TESTIMONY GIVEN ON DECEMBER 10, 2019, DECLARATION FILED ON FEBRUARY 18, 2020. (HON. PAMELA K. CHEN)

31. *QUEST SOFTWARE, INC.* V. *NIKE, INC.*, UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON, PORTLAND DIVISION, CASE NO. 3:18-CV-00721, EXPERT REPORT FILED ON JULY 19, 2019. (HON. KARIN J. IMMERGUT)

32. *JRV, LLC ET AL. V. WINERY EXCHANGE, INC.*, JAMS ARBITRATION – SAN FRANCISCO RESOLUTION CENTER, REFERENCE NUMBER 1100090897, EXPERT REPORT FILED ON MAY 15, 2019, REBUTTAL REPORT FILED ON MAY 25, 2019, DEPOSITION TESTIMONY GIVEN ON

FILED UNDER SEAL

MAY 28, 2019, ARBITRATION TESTIMONY GIVEN ON JUNE 20, 2019. (MS. ZELA "ZEE" G. CLAIBORNE, ESQ.)

33. *BK TRUCKING CO. ET AL. V. PACCAR, INC. ET AL.*, UNITED STATES DISTRICT COURT, DISTRICT OF NEW JERSEY, CASE NO. 1:15-CV-02282-JPS-AMD, EXPERT REPORT FILED ON JANUARY 14, 2019, SUPPLEMENTAL REPORT FILED ON APRIL 12, 2019, REBUTTAL REPORT FILED ON JUNE 7, 2019, DEPOSITION TESTIMONY GIVEN ON JUNE 19, 2019. (HON. JEROME B. SIMANDLE)

34. *ROADRUNNER INTERMODAL SERVICES, LLC V. T.G.S. TRANSPORTATION, INC.*, U.S. DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA, CASE NO. 1:17-CV-01056-DAD-BAM, DECLARATION FILED ON OCTOBER 24, 2017, EXPERT REPORT FILED ON MARCH 11, 2019, DEPOSITION TESTIMONY GIVEN ON APRIL 4, 2019, SUPPLEMENTAL REPORT FILED ON APRIL 12, 2019, DEPOSITION TESTIMONY GIVEN ON APRIL 23, 2019. (HON. DALE A. DROZD)

35. *MANUFACTURING RESOURCES INTERNATIONAL, INC. V. CIVIQ SMARTSCAPES, LLC ET AL.*, UNITED STATES DISTRICT COURT, DISTRICT OF DELAWARE, CASE NO. 1:17-CV-00269-RGA, EXPERT REPORT FILED ON FEBRUARY 19, 2019, DEPOSITION TESTIMONY GIVEN ON APRIL 2, 2019. (HON. RICHARD G. ANDREWS)

36. *MICREL, LLC V. RAY ZINN*, SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF SAN MATEO, CASE NO. 538785, EXPERT REPORT FILED ON MARCH 23, 2017, DEPOSITION TESTIMONY GIVEN ON APRIL 26, 2017, TRIAL TESTIMONY GIVEN ON JANUARY 10, 2019. (HON. RICHARD H. DUBOIS)

37. *JOHANNESSOHN ET AL. V. POLARIS INDUSTRIES, INC.*, UNITED STATES DISTRICT COURT, DISTRICT OF MONTANA, CASE NO. 0:16-CV-03348-PJS-LIB, EXPERT REPORT FILED ON NOVEMBER 16, 2018, DEPOSITION TESTIMONY GIVEN ON JANUARY 17, 2019, EXPERT REPORT FILED ON MARCH 21, 2019. (HON. NANCY BRASEL) – OPPOSING EXPERT WAS NOBEL PRIZE WINNER DANIEL MACFADDEN.

38. *TQ DELTA, LLC V. 2WIRE, INC.*, UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, CASE NO. 13-CV-1835-RGA, EXPERT REPORT FILED ON NOVEMBER 9, 2018, EXPERT REPORT FILED ON NOVEMBER 29, 2018, DEPOSITION TESTIMONY GIVEN ON DECEMBER 17, 2018, EXPERT REPORT FILED ON DECEMBER 28, 2018, DEPOSITION TESTIMONY GIVEN ON JANUARY 29, 2019. (HON. RICHARD G. ANDREWS)

39. *DELL'ORO GROUP, INC. V. 650 GROUP, LLC ET AL.*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION, CASE NO. 3:17-CV-00750-JD, EXPERT REPORT FILED ON AUGUST 7, 2018, DECLARATION FILED ON SEPTEMBER 10, 2018, AND SUPPLEMENTAL EXPERT REPORT FILED ON SEPTEMBER 20, 2018. (HON. JAMES DONATO)

40. *COPART, INC. V. SPARTA CONSULTING*, U.S. DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA, CASE NO. 2:14-CV-0046-KJM-CKD, AFFIRMATIVE EXPERT REPORT REGARDING

FILED UNDER SEAL

COUNTER-CLAIMS, MAY 31, 2016, REBUTTAL REPORT REGARDING CONTRACT CLAIMS FILED ON NOVEMBER 24, 2016, REBUTTAL REPORT REGARDING TRADE SECRET CLAIMS FILED ON DECEMBER 16, 2016, DEPOSITION TESTIMONY GIVEN ON JANUARY 17, 2017, TRIAL TESTIMONY GIVEN ON MAY 16, 2018. (HON. KIMBERLY J. MUELLER)

41. *CAMSOFT DATA SYSTEMS, INC. V. SOUTHERN ELECTRONICS SUPPLY, INC.*, UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA, CASE NO. 3:09-CV-01047, EXPERT REPORT FILED APRIL 14, 2018. (HON. JANICE CLARK)

42. *QUANTUMSCAPE CORPORATION V. Z. CHEN & K. KERMAN*, JUDICIAL ARBITRATION AND MEDIATION SERVICES, INC., REFERENCE NUMBER 1100088671, DEPOSITION TESTIMONY GIVEN APRIL 10, 2018.

43. *THE PARALLAX GROUP INTERNATIONAL, LLC V. INCSTORES, LLC*, U.S. DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA, THE SOUTHERN DISTRICT, CASE NO. 8:16-CV-929-AG-DFM, EXPERT REPORT FILED ON AUGUST 3, 2017, DEPOSITION TESTIMONY GIVEN ON MARCH 20, 2018. (HON. ANDREW J. GUILFORD)

44. *POLYGROUP LIMITED (MCO), (PETITIONER) V. WILLIS ELECTRIC COMPANY, LIMITED (PATENT OWNER)*, UNITED STATES PATENT AND TRADEMARK OFFICE BEFORE THE PATENT TRIAL AND APPEAL BOARD, CASE NOS. IPR2016-01610; -01612, DECLARATION FILED ON AUGUST 23, 2017, DEPOSITION TESTIMONY GIVEN ON SEPTEMBER 26, 2017, AND, SUPPLEMENTAL DECLARATION FILED ON NOVEMBER 13, 2017, AND ON DECEMBER 8, 2017.

45. *EVOLVED WIRELESS, LLC V. LENOVO GROUP, LTD., LENOVO (UNITED STATES) INC., AND MOTOROLA MOBILITY LLC*, U.S. DISTRICT COURT DISTRICT OF DELAWARE, CASE NO. 1:15-CV-00544-SLR, EXPERT REPORT FILED ON JULY 17, 2017, DEPOSITION TESTIMONY GIVEN ON AUGUST 15, 2017. (HON. SUE LEWIS ROBINSON)

46. *THE REGENTS OF THE UNIVERSITY OF CALIFORNIA V. ST. JUDE MEDICAL, INC.*, U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION, CASE NO. 4:16-CV-06210-YGR. (HON. YVONNE GONZALEZ ROGERS)

47. *BEHINDTHECHAIR.COM V. D. CHRISTAL; OLAPLEX, LLC; LIQWD, INC.*, SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES, LASC CASE NO. BC 569584, EXPERT REPORT FILED

FILED UNDER SEAL

APRIL 6, 2017, DEPOSITION TESTIMONY GIVEN ON APRIL 13, 2017. (HON. DEBRE K. WEINTRAUB)

48. *ROBERT LARSEN ET AL. V. VIZIO, INC.*, UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION, CASE NO. 8:14-CV-01865-CJC-JCG, EXPERT REPORT COMPLETED MARCH 27, 2017. (HON. CORMAC J. CARNEY)

49. *JOANNA C. SULLIVAN V. STEPHEN A. FINN*, UNITED STATES DISTRICT COURT, CALIFORNIA NORTHERN DISTRICT, CASE NO. 3:16:CV-01948-WHO, EXPERT REPORT FILED ON MARCH 1, 2017. (HON. WILLIAM H. ORRICK)

50. *IMPROVED SEARCH, LLC V. AOL, INC.*, IN THE UNITED STATES DISTRICT FOR THE DISTRICT OF DELAWARE, CASE NO. 12-262 (SLR) (SRF). (HON. LEONARD P. STARK)

51. *SAN FRANCISCO NEWS PAPER COMPANY LLC V. HEARST CORPORATION ET AL.*, SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE CITY AND COUNTY OF SAN FRANCISCO, CASE NO. CGC-13-532369, EXPERT REPORT FILED ON NOVEMBER 10, 2016; DEPOSITION TESTIMONY GIVEN ON DECEMBER 9, 2016; SUPPLEMENTAL REPORT FILED ON APRIL 24, 2017; AND, DEPOSITION TESTIMONY GIVEN ON MAY 23, 2017. (HON. CURTIS E. KARNOW)

52. *REILY FOODS COMPANY, INC. V. SCHIFF FOOD PRODUCTS COMPANY, INC. ET AL.*, U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA, CIVIL ACTION NO. 16-01505, EXPERT REPORT FILED ON DECEMBER 6, 2016, MEDIATION DECEMBER 7 – 8, 2016. (HON. JANE TRICHE MILAZZO)

53. *RECOVERY VILLAGE AT UMATILLA, L.L.C. V. HUMANA HEALTH INSURANCE COMPANY OF FLORIDA, INC. ET AL.*, IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA, COMPLEX LITIGATION UNIT, CASE NO. CACE 15-014725(07), EXPERT REPORT COMPLETED ON DECEMBER 16, 2016.

54. *FATPIPE, INC. V. TALARI NETWORKS, INC.*, U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS, TYLER DIVISION, CASE NO. 6:15-CV-00458-RWS. (HON. ROBERT W. SCHROEDER, III)

55. *STATE OF OREGON, THE OREGON HEALTH AUTHORITY, AND THE OREGON DEPARTMENT OF HUMAN SERVICES; THE OREGON HEALTH INSURANCE EXCHANGE CORPORATION, DBA COVER OREGON V. ORACLE AMERICA, INC. ET AL.*, IN THE CIRCUIT COURT OF THE STATE

FILED UNDER SEAL

OF OREGON, FOR THE COUNTY OF MARION, NO. 14 C 20043.  CASE SETTLED ON SEPTEMBER 15, 2015. (HON. ANNA J. BROWN).

56. *CLOS LACHANCE WINES, INC. V. A.V. BRANDS, INC.*, JAMS ARBITRATION, EXPERT REPORT AND DEPOSITION TESTIMONY FILED AND GIVEN ON FEBRUARY 19, 2016, ARBITRATION TESTIMONY GIVEN ON MARCH 8, 2016.

57. *RACING OPTICS, INC. V. AEVOE CORPORATION*, U.S. DISTRICT COURT FOR THE DISTRICT OF NEVADA, CIVIL ACTION NO. 2:15-CV-01774-JCM-VCF. (HON. ROBERT C. JONES)

58. *FERRING B.V. V. FERA PHARMACEUTICALS, LLC, PERRIGO COMPANY, PERRIGO COMPANY PLC, PERRIGO COMPANY OF TENNESSEE, AND PERRIGO NEW YORK, INC.*, U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK, CIVIL ACTION NO. 2:13-CV-04640, EXPERT REPORT, DECEMBER 11, 2015. (HON. SANDRA J. FEUERSTEIN)

59. *HEARTLAND PAYMENT SYSTEMS, INC. V. MERCURY PAYMENT SYSTEMS*, LLC, U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION, CASE NO. 3:14-CV-00437-JCS. (HON. JOSEPH C. SPERO)

60. *EMBLAZE LTD. V. MICROSOFT CORPORATION*, U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 3:12-CV-5422 JST. (HON. YVONNE GONZALEZ ROGERS)

61. *FORMFACTOR, INC. V. MARTEK, INC.*, U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION, CASE NO. 3:14-CV-01122, EXPERT REPORT MAY 1, 2015. (HON. JAMES DONATO)

62. *BETTER MOUSE COMPANY, LLC V. STEELSERIES APS; AND STEELSERIES NORTH AMERICA CORP.*, U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS, MARSHALL DIVISION, CASE NO. 2:14-CV-198, EXPERT REPORT, FILED ON SEPTEMBER 24, 2015, TRIAL TESTIMONY GIVEN ON JANUARY 13, 2016. (HON. ROY S. PAYNE)

63. *INTERSTATE FIRE & CASUALTY COMPANY AND FIREMEN'S FUND INSURANCE COMPANY V. APARTMENT MANAGEMENT CONSULTANTS, LLC, SUNRIDGE PARTNERS, LLC, AND AMBER NICOLE LOMPE*, U.S. DISTRICT COURT FOR THE DISTRICT OF WYOMING, CIVIL ACTION NO. 13-CV-278 J, EXPERT REPORT MARCH 18, 2015, DEPOSITION TESTIMONY, JUNE 8, 2015, AND SUPPLEMENTAL EXPERT REPORT, AUGUST 13, 2015. (HON. ALAN B. JOHNSON)

64. *GOOD TECHNOLOGY CORPORATION AND GOOD TECHNOLOGY SOFTWARE, INC. V. MOBILEIRON, INC.,* U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION CASE NO. 12-05826-EDL, EXPERT REPORT FILED ON JANUARY 9, 2015

FILED UNDER SEAL

AND FEBRUARY 13, 2015; AND, TRIAL TESTIMONY GIVEN ON JULY 28, 2015. (HON. PAUL SINGH GREWAL)

65. *FUJIFILM CORPORATION V. <u>MOTOROLA MOBILITY LLC</u>*, UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA SAN FRANCISCO DIVISION CASE NO. C 12-03587 RS, EXPERT REPORT FILED ON OCTOBER 31, 2014 AND JANUARY 15, 2015; DEPOSITION TESTIMONY GIVEN ON NOVEMBER 18, 2014; AND, JANUARY 26, 2015; AND, TRIAL TESTIMONY GIVEN ON APRIL 28, 2015. (HON. WILLIAM H. ORRICK)

66. *COE ET AL. V. <u>PHILIPS ORAL HEALTHCARE, INC.</u>*, UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON MASTER DOCKET NO. 2:13-CV-00518-MJP. (HON. MARSHA J. PECHMAN)

67. *<u>VENTURE CORPORATION LTD AND VENTURE DESIGN SERVICES, INC.</u> V. JAMES BARRETT*, U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA CASE NO. CV-13-03384-PSG (ADR), EXPERT REPORT FILED ON OCTOBER 6, 2014. (HON. PAUL SINGH GREWAL)

68. *M. VILLANUEVA ET AL. V. <u>FIDELITY NATIONAL TITLE COMPANY, ET AL.</u>*, SANTA CLARA COUNTY SUPERIOR COURT CASE NO. 1-10-CV-173356, EXPERT REPORT FILED ON MARCH 20, 2014, DEPOSITION TESTIMONY GIVEN ON MARCH 21, 2014; AND, TRIAL TESTIMONY GIVEN ON MAY 15, 2014. (HON. PETER H. KIRWAN)

69. *FEDERAL HOUSING FINANCE AGENCY, ETC. V. <u>JPMORGAN CHASE ET AL.</u>*, U.S. DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK CASE NO. 11 CIV. 6188(DLC). (HON. DENISE COTE)

70. *KB HOMES V. <u>K&L GATES, LLP (AKA KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP) ET AL</u>*, LOS ANGELES COUNTY SUPERIOR COURT CASE NO. BC484090, REBUTTAL

FILED UNDER SEAL

DECLARATION FILED ON MAY 5, 2014, EXPERT REPORT FILED ON JANUARY 17, 2014, AND DEPOSITION TESTIMONY GIVEN ON JANUARY 23, 2014. (HON. WILLIAM F. HIGHBERGER)

71. *GALENA STREET FUND, L.P. V. WELLS FARGO BANK, N.A.*, U.S. DISTRICT COURT FOR THE DISTRICT OF COLORADO CASE NO. 1:12-CV-00587-MSK, EXPERT REPORT FILED ON MAY 2, 2014. (HON. MICHAEL J. WANTANABE)

72. *HYPHENATED SYSTEMS, LLC V. BRUKER NANO, INC. ET AL*, SANTA ANA COUNTY SUPERIOR COURT, UNLIMITED JURISDICTION CASE NO. 1-11-CV212650, EXPERT REPORT AND DEPOSITION TESTIMONY FILED AND GIVEN ON OCTOBER 22, 2013.

73. *HENRY A., ET AL. V. MICHAEL WILLDEN, ET AL*, U.S. DISTRICT COURT, DISTRICT OF NEVADA CASE NO. 2:10-CV-00528- RCJ-PAL. (HON. ROBERT C. JONES)

74. *UTHE TECHNOLOGY CORPORATION V. AETRIUM, INC., HENRY ALLEN, ET AL*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION CASE NO. 3:95-CV-02377-WHA, EXPERT REPORT FILED ON JUNE 14, 2013, AND DEPOSITION TESTIMONY GIVEN ON JUNE 19, 2013. (HON. WILLIAM ALSUP)

75. *RICHARD COHEN V. ROBERT TALBOTT, INC.,* AMERICAN ARBITRATION ASSOCIATION CASE NO. 74 116 170 11 DECR.

76. *WIRELESS INK CORPORATION V. FACEBOOK, INC., GOOGLE, INC., YOUTUBE, INC., YOUTUBE LLC, AND MYSPACE, INC.*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK CASE NO. 10-CV-1841 AND 11.CV-1751, DECLARATION ON AUGUST 6, 2012. (HON. P. KEVIN CASTEL)

77. *ALLIED FELLOWSHIP SERVICE V. RMD SERVICES I, LLC ET AL.*, ALAMEDA COUNTY SUPERIOR COURT CASE NO. RG09488702. (HON. P. KEVIN CASTEL)

78. *WHITTLESTONE, INC. V. HANDI-CRAFT COMPANY*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION CASE NO. 08-04193 SBA, EXPERT REPORT FILED ON MAY 14, 2012, AND DEPOSITION TESTIMONY GIVEN ON JUNE 14, 2012. (HON. JACQUELINE SCOTT CORLEY)

79. *C. SCLIMENTI V. THE LELAND STANFORD JUNIOR UNIVERSITY ET AL.*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF CALIFORNIA CASE NO. 08-CV-01730-W-BLM, EXPERT REPORT FILED

FILED UNDER SEAL

ON FEBRUARY 1, 2011, AND DEPOSITION TESTIMONY GIVEN ON MAY 6, 2011. (HON. ANTHONY J. BATTAGLIA)

80. *CARDSTORE.COM, INC. F/K/A INK2 CORPORATION V. MIMEO.COM, INC*., JAMS ARBITRATION, EXPERT REPORT COMPLETED ON DECEMBER 21, 2010 (SETTLED DATE OF FILING).

81. *DWS INTERNATIONAL, INC. DBA MARBLE DIMENSIONS WORLDWIDE V. MEIXIA ARTS AND HANDCRAFTS CO. LTD., HOME CASUAL, LLC, ET AL*, U.S. DISTRICT COURT, SOUTHERN DISTRICT OF OHIO, CASE NO. 3:09CV458, EXPERT REPORT FILED ON AUGUST 16, 2010, DEPOSITION TESTIMONY GIVEN ON JANUARY 21, 2011 AND, TRIAL TESTIMONY GIVEN ON JUNE 24, 2011. (HON. THOMAS M. ROSE)

82. *LBV ASSET MANAGEMENT LLP ET AL. V. SGAM NEWEDGE MANAGEMENT, INC. ET AL*, JAMS ARBITRATION, EXPERT REPORT FILED ON APRIL 28, 2010, SUPPLEMENTAL EXPERT REPORT FILED ON JUNE 2, 2010, AND ARBITRATION TESTIMONY GIVEN ON JUNE 10, 2010.

83. *CELSO ROBLEDO ET AL. V. CITY OF CHICAGO ET AL*., U.S. DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION CASE NO. 05 C 0335, EXPERT REPORT FILED ON NOVEMBER 21, 2008. (HON. ELAINE E. BUCKLO)

84. *COACHMEN INDUSTRIES ET AL. V. CRANE COMPOSITES, INC. F/K/A KEMLITE*, U.S. DISTRICT COURT, NORTHERN DISTRICT OF INDIANA CASE NO. 3:06-CV-0160-CAN, EXPERT REPORT FILED ON JULY 1, 2007 AND SEPARATE EXPERT REPORT FILED ON JUNE 21, 2007 AND JULY 1, 2007. (HON. CHRISTOPHER A. NEUCHTERLEIN)

85. *TIFFANY BLACKWELL ET AL. V. SKYWEST AIRLINES, INC*., U.S. DISTRICT COURT, SOUTHERN DISTRICT OF CALIFORNIA CASE NO. 06CV0307, EXPERT REPORT FILED ON JUNE 25, 2007. (HON. DANA M. SABRAW)

~~FILED UNDER SEAL~~
~~2604~~

# Appendix 2

Richard Eichmann
May 28, 2026

~~FILED UNDER SEAL~~
**Materials Relied Upon**

## Case Law

- *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), available at https://supreme.justia.com/cases/federal/us/547/388/, accessed May 20, 2026.

## Expert Reports

- Declaration of Brian Luettke in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026, and Exhibits.
- Declaration of Lawrence DeMonico in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026, and Exhibits.

## Legal Filings

- *ABC IP, LLC and Rare Breed Triggers, Inc., v. Timothy Hoffman and Hoffman Tactical LLC*, Memorandum, February 11, 2026.
- *ABC IP, LLC and Rare Breed Triggers, Inc., v. Timothy Hoffman and Hoffman Tactical LLC*, Preliminary Injunction, February 11, 2026.
- *ABC IP, LLC et al., v. 80MILLS LLC, et al., ABC IP, LLC et al., v. Christopher Cope, ABC IP, LLC et al., v. DNT LLC et al., ABC IP, LLC et al., v. Hanes Tactical, LLC et al., ABC IP, LLC et al., v. Harrison Gunworks LLC et al., ABC IP, LLC et al., v. Mars Trigger, LLC et al., ABC IP, LLC et al., v. Mister Guns, LLC et al., ABC IP, LLC et al., v. Steven Thanh Nguyen, ABC IP, LLC et al., v. Optics Planet, Inc., ABC IP, LLC et al., v. PistolCap Limited Company et al., ABC IP, LLC et al., v. ProSource Firearms, LLC, ABC IP, LLC et al., v. Superior Firearms of Texas, LLC, ABC IP, LLC et al., v. Z3 Productions, LLC*, Consolidated Motion for Preliminary Injunction, May 28, 2026, and appendices.
- *ABC IP, LLC et al., v. 80MILLS LLC, et al.*, Fourth Amended Complaint for Patent Infringement, May 26, 2026.
- *ABC IP, LLC et al., v. Christopher Cope*, Second Amended Complaint for Patent Infringement, May 26, 2026.
- *ABC IP, LLC et al., v. DNT LLC et al.*, Sixth Amended Complaint for Patent Litigation, May 27, 2026.
- *ABC IP, LLC et al., v. Hanes Tactical, LLC et al.*, Fourth Amended Complaint for Patent Infringement, May 26, 2026.
- *ABC IP, LLC et al., v. Harrison Gunworks LLC et al.*, Third Amended Complaint for Patent Infringement, May 27, 2026.
- *ABC IP, LLC et al., v. MaRs Trigger, LLC et al.*, Second Amended Complaint for Patent Infringement, May 27, 2026.
- *ABC IP, LLC et al., v. Mister Guns, LLC et al.*, Second Amended Complaint for Patent Infringement, May 26, 2026.
- *ABC IP, LLC et al., v. Optics Planet, Inc.*, Amended Complaint for Patent Infringement, May 27, 2026.
- *ABC IP, LLC et al., v. PistolCap Limited Company et al.*, Second Amended Complaint for Patent Infringement, May 26, 2026.
- *ABC IP, LLC et al., v. ProSource Firearms, LLC*, Second Amended Complaint for Patent Infringement, May 26, 2026.

1

~~FILED UNDER SEAL~~

**Materials Relied Upon**

- *ABC IP, LLC et al., v. Steven Thanh Nguyen*, Third Amended Complaint for Patent Infringement, May 27, 2026.

- *ABC IP, LLC et al., v. Superior Firearms of Texas, LLC*, Second Amended Complaint for Patent Infringement, May 27, 2026.

- *ABC IP, LLC et al., v. Z3 Productions, LLC*, Third Amended Complaint for Patent Infringement, May 26, 2026.

<u>**Literature**</u>

- Anderson, J. Jonas, "Nontechnical Disclosure," *Vanderbilt Law Review* 69, no. 6 (2016):1573-1602, available at https://cdn.vanderbilt.edu/vu-wp0/wp-content/uploads/sites/89/2016/11/30103806/Nontechnical-Disclosure.pdf, accessed May 20, 2026.

- Arthur, W. Brian, "Competing Technologies, Increasing Returns, and Lock-In by Historical Events," *Economic Journal* 99, no. 394 (1989): 116-131, available at https://www.jstor.org/stable/2234208, accessed May 20, 2026.

- Bebchuk, Lucian A., "Property Rights and Liability Rules: The Ex Ante View of the Cathedral," Michigan Law Review 100, no. 3 (2001): 601-639.

- Berry, Steven T. and Philip A. Haile, "Identification in Differentiated Products Markets Using Market Level Data," Cowles Foundation Discussion Paper No. 1744, January 2010, updated February 2010, available at https://cowles.yale.edu/sites/default/files/2022-09/d1744.pdf, accessed May 20, 2026.

- Billy, Alexander and Neel Sukhatme, "Perception Pending: What Do Patents Signal to Consumers?" *Journal of Empirical Legal Studies* 22, no. 2 (2025): 163-184, available at https://repository.law.umich.edu/cgi/viewcontent.cgi?article=4115&context=facarticles, accessed May 20, 2026.

- Bladon, Annabelle Jade, et al., "Developing a frame of reference for fisheries management and conservation interventions," *Fisheries Research* 208 (2018): 296-308, available at https://www.sciencedirect.com/science/article/pii/S0165783618302315, accessed May 20, 2026.

- Bronnenberg, Bart J., and Jean-Pierre Dube, "The Formation of Consumer Brand Preferences," NBER Working Paper Series (2016), available at https://www.nber.org/system/files/working_papers/w22691/w22691.pdf, accessed May 20, 2026.

- Calabresi, Guido and A. Douglas Melamed, "Property Rules, Liability Rules, and Inalienability: One View of the Cathedral," *Harvard Law Review* 85, no. 6 (1972): 1089-1128.

- Carlton, Dennis W., "Barriers to Entry," *Issues in Competition Law and Policy* 1 (2008): 601-617.

- Coase, R.H., "Durability and Monopoly," *Journal of Law and Economics* 15, no. 1 (1972): 143-149.

- Coate, Malcolm B. and Mark R. Fratrik, "Dual Distribution as a Vertical Control Device," FTC Bureau of Economics Working Paper No. 143 (1986), available at https://www.ftc.gov/sites/default/files/documents/reports/dual-distribution-vertical-control-device/wp143.pdf, accessed May 26, 2026.

- David, Paul A., "Clio and the Economics of QWERTY," *American Economic Review* 75, no. 2 (1985): 332-337, available at https://www.jstor.org/stable/1805621, accessed May 20, 2026.

- Farrell, Joseph and Paul Klemperer, "Coordination and Lock-In: Competition with Switching Costs and Network Effects," Working Paper (2006), available at https://www.nuff.ox.ac.uk/economics/papers/2006/w7/Farrell_KlempererWP.pdf, accessed May 20, 2026.

~~FILED UNDER SEAL~~
**Materials Relied Upon**

- Funaki, Yukihiko, et al., "Price stickiness and strategic uncertainty: An experimental study," *Journal of Economic Dynamics and Control* 180 (2025).

- Healy, Paul M. et al., "Market Competition, Earnings Management, and Persistence in Accounting Profitability Around the World," *Review of Accounting Studies (forthcoming)* (2014), available at https://dash.harvard.edu/server/api/core/bitstreams/7312037d-586c-6bd4-e053-0100007fdf3b/content, accessed May 20, 2026.

- Jia, Justin, Jia Li, and Weixin Liu, "Expectation-based consumer purchase decisions: behavioral modeling and observations," *Marketing Letters* (2022): 1-17, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9676804/, accessed May 20, 2026.

- Kerin, Roger A., Rajan P. Varadarajan, and Robert A. Peterson, "First-Mover Advantage: A Synthesis, Conceptual Framework, and Research Propositions," *Journal of Marketing* 56, no. 4 (1992): 33-52.

- Khanna, Naveen, and Sheri Tice, "The Bright Side of Internal Capital Markets," *Journal of Finance* 56, no. 4 (2001): 1489-1528.

- Kim, Hyunseaob and Howard Kung, "Asset Redeployability, Economic Uncertainty, and Corporate Investment," Working Paper (2013): 1-47, available at https://pages.stern.nyu.edu/~agavazza/kim3.pdf, accessed May 20, 2026.

- Lazzarini, Sérgio G. et al., "The Normative Core of Relational Stakeholder Strategies: Explaining Open Buyer-Supplier Relations in the Context of the Amazon Rainforest," *Business Ethics Quarterly* (2025): 1-43, https://www.cambridge.org/core/journals/business-ethics-quarterly/article/normative-core-of-relational-stakeholder-strategies-explaining-open-buyersupplier-relations-in-the-context-of-the-amazon-rainforest/30828954277DDF4070BA806942B051D6, accessed May 20, 2026.

- Levin, Richard C. et al., "Appropriating Returns from Industrial Research and Development," *Brookings Papers on Economic Activity* 3 (1987): 783-832.

- Manta, Irina D., "Blunting the Later-Mover Advantage: Intellectual Property and Knowledge Transfer," *Akron Law Journals* 52, no. 3 (2019): 877-910, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3420210, accessed May 20, 2026.

- Milgrom, Paul and John Roberts, "Predation, reputation, and entry deterrence," *Journal of Economic Theory* 27, no. 2 (1982): 280-312.

- Nagle, Thomas T. and Georg Müller, *The Strategy and Tactics of Pricing*, 6th ed. (New York: Routledge, 2018).

- National Research Council, *Reference Manual on Scientific Evidence*, 3rd ed. (Washington, DC: The National Academies Press, 2011), available at https://www.fjc.gov/sites/default/files/materials/21/SciMan3D01.pdf, accessed May 20, 2026.

- Ogus, Anthony and Louis Visscher, "A Law and Economics Perspective on Injunctive Relief," *Maastricht Journal of European and Comparative Law* 17, no. 1 (2010): 32-47.

- Pindyck, Robert S., "Irreversibility, Uncertainty, and Investment," *Journal of Economic Literature* 29, no. 3 (1991): 1110-1148.

- Rindova, Violina P. et al., "Being Good or Being Known: An Empirical Examination of the Dimensions, Antecedents, and Consequences of Organizational Reputation," *Academic of Management Journal* 48, no. 6 (2005): 1033-1049.

- Robinson, William T., Gurumurthy Kalyanaram, and Glen L. Urban, "First-Mover Advantages from Pioneering New Markets: A Survey of Empirical Evidence," *Review of Industrial Organization* 9, no. 1 (1994): 1-23.

~~FILED UNDER SEAL~~
**Materials Relied Upon**

- Sakhartov, Arkadiy, "Corporate Diversification and Risk: Portfolio Effects and Resource Redeployability," *Strategy Science* 7, no. 4 (2022): 317-329.

- Shapiro, Carl, "Property Rules vs. Liability Rules for Patent Infringement," *University of California at Berkeley Working Paper* (2017), available at https://faculty.haas.berkeley.edu/shapiro/propvsliab.pdf, accessed May 20, 2026.

- Sidak, F. Gregory, "Irreparable Harm from Patent Infringement," *The Criterion Journal on Innovation* 2 (2017): 1-6, available at https://www.criterioninnovation.com/articles/sidak-irreparable-harm-from-patent-infringement.pdf, accessed May 20, 2026.

- Šostar, Marko and Vladimir Ristanović,  "Assessment of Influencing Factors on Consumer Behavior using the AHP Model," *Sustainability* 15, no. 13 (2023), available at https://www.mdpi.com/2071-1050/15/13/10341, accessed May 26, 2026.

- Stern, Ariel Dora, "Innovation under Regulatory Uncertainty: Evidence from Medical Technology," *Journal of Public Economics* 145 (2017): 181-200.

- Teece, David, "Profiting from Technological Innovation: Implications for Integration, Collaboration, Licensing and Public Policy," *Research Policy* 15, no. 6 (1986): 285-305.

- Tisdell, Clem, and Irmi Seifl, "Niches and economic competition: implications for economic efficiency, growth and diversity," *Structural Change and Economic Dynamics* 15 (2004): 119-135.

- Zachary, Miles A. et al., "Entry Timing: Enduring Lessons and Future," *Journal of Management* 41, no. 5: 1388-1415, available at https://doi.org/10.1177/0149206314563982, accessed May 20, 2026.


**Publicly Available / Websites**

- "7 Types of Distributors (Plus Considerations for Choosing One)," Indeed, December 11, 2025, available at https://www.indeed.com/career-advice/career-development/types-of-distributors, accessed May 20, 2026.

- "About Us," Polymer Pew, available at https://polymerpew.com/about-us/, accessed May 27, 2026.

- "Commodity Substitution, Sample Space and New Goods," Chapter 9, International Monetary Fund, available at  https://www.elibrary.imf.org/display/book/9781589067806/ch09.xml, accessed May 22, 2026.

- "Department of Justice Announces Settlement of Litigation Between the Federal Government and Rare Breed Triggers," Office of Public Affairs, U.S. Department of Justice, May 16, 2025, available at https://www.justice.gov/opa/pr/department-justice-announces-settlement-litigation-between-federal-government-and-rare-breed, accessed May 20, 2026.

- "Frequently Asked Questions - Rarebreed Triggers," available at https://rarebreedtriggers.com/faqs/, accessed May 20, 2026.

- "FRT-15L3™ Single-Stage (3-Position) Forced Reset Trigger for the AR-15," Rare Breed Triggers, available at https://rarebreedtriggers.com/product/frt-15l3-2/, accessed May 27, 2026.

- "FRT-MR3™ Single-Stage (3-Position) Forced Reset Trigger for the HK MR223 & HK MR556," Rare Breed Triggers, available at https://rarebreedtriggers.com/product/frt-mr3/, accessed May 27, 2026.

- "Instilling Brand and Core Values into Your Pricing Strategy," FintastIQ, January 31, 2025, available at https://www.fintastiq.com/blog/instilling-brand-and-core-values-into-your-pricing-strategynbsp, accessed May 20, 2026.

- "Legal Status of Rare Breed Triggers' Forced Reset Triggers - Rarebreed Triggers," Rare Breed Triggers, available at https://rarebreedtriggers.com/legal-status/, accessed May 20, 2026.

4

~~FILED UNDER SEAL~~
**Materials Relied Upon**

- "Price Erosion: What Is It, and How Do You Stop It?" GreyScout, February 13, 2024, available at https://greyscout.com/price-erosion-what-is-it-and-how-do-you-stop-it/, accessed May 20, 2026.

- "Super Safety – Hoffman Technical," Hoffman Technical, available at https://hoffmantactical.com/designs/super-safety/, accessed May 20, 2026.

- "The Role of Substitution in Commodity Demand," The World Bank, available at https://thedocs.worldbank.org/en/doc/727481572033451039-0050022019/original/CMOOctober2019SpecialFocus.pdf, accessed May 20, 2026.

- Fernando, Jason, "Commodities in the Stock Market: Definition, Types, and Investment Roles," Investopedia, April 12, 2026, available at https://www.investopedia.com/terms/c/commodity.asp, accessed May 20, 2026.

- Langer, Daniel, "Luxury Unfiltered: The true cost of cutting luxury prices," Luxury Daily, September 11, 2024, available at https://www.luxurydaily.com/luxury-unfiltered-the-true-cost-of-cutting-luxury-prices/, accessed May 20, 2026.

- Musquera, Anna Vinals and Scott Babwah Brennen, "Regulatory uncertainty is what actually holds back innovation," Brookings, available at https://www.brookings.edu/articles/regulatory-uncertainty-is-what-actually-holds-back-innovation/, accessed May 26, 2026.

- Quinn, Gene, "The theory of patents and why strong patents benefit consumers," IPWatchdog, November 24, 2025, available at https://ipwatchdog.com/2015/11/24/theory-patents-strong-patents-benefit-consumers/, accessed May 20, 2026.

**Miscellaneous**

- 80Mills LLC, Articles of Organization (Wyoming Secretary of State, filed January 19, 2024).

- Deez Nutz Tactical LLC, Certificate of Organization (State of Idaho Secretary of State, filed April 15, 2024).

- Hanes Tactical LLC, Certificate of Formation (Texas Secretary of State, filed February 11, 2025).

- Harrison Gunworks LLC, Certificate of Organization (State of Idaho Secretary of State, filed May 30, 2024).

- MaRs Trigger LLC, Certificate of Formation (Texas Secretary of State, filed March 10, 2025).

- Mister Guns LLC, Certificate of Formation (Texas Secretary of State, filed June 20, 2011).

- Optics Planet, Inc., Business Entity Search (Illinois Secretary of State, Incorporation date October 12, 2000).

- PistolCap Limited Company, Certificate of Formation (Texas Secretary of State, filed October 21, 2020).

- ProSource Firearms LLC, Certificate of Formation (Texas Secretary of State, filed December 28, 2020).

- Superior Firearms of Texas LLC, Certificate of Formation (Texas Secretary of State, filed May 30, 2018).

- Van Tan Technologies LLC, Business Organizations Inquiry (Texas Secretary of State, Certificate of formation filed December 20, 2024).

- Z3 Productions LLC, Entity Summary Information (Oklahoma Secretary of State, Formation date January 9, 2025).